(March 3, 1914.)

BARBER LUMBER CO., Plaintiff, v. WILFRED L. GIF-
FORD, as Secretary of State of the State of Idaho,
Defendant.

[139 Pac. 557.]

MANDAMUS—STATE BOARD OF LAND COMMISSIONERS—SALE OF STATE
TIMBER—PUBLIC AUCTION—DISCRETION OF BOARD—CONSTITUTION
AND STATUTORY CONSTRUCTION.

1. Under the provisions of sec. 7, art. 9, of the state constitution, the governor, superintendent of public instruction, Secretary of State and the attorney general shall constitute the board of land commissioners who have the direction, control and disposition of the public lands of the state under such regulations as may be prescribed by law.

2. Under the provisions of sec. 8 of said article, it is made the duty of said board to provide for the location, protection, sale or rental of state lands under such regulations as may be prescribed by law, and in such manner as will secure the maximum possible amount therefor; and the legislature is required to provide by law that such lands shall be judiciously located and carefully preserved and held in trust, subject to the disposal at public auction, for the

use and benefit of the respective objects for which said grants of land were made, and provide for the sale of said lands from time to time and for the sale of timber on such lands and for the faithful application of the proceeds thereof in accordance with the terms of the several grants.

3.  In compliance with said provisions of the constitution, the legislature has passed title 9 of the Civil Code, entitled "Public Lands," including a number of sections, beginning with sec. 1558, Rev. Codes, and amendments thereto.

4.  *Held,* under the facts, that the sale of the timber involved in this case was made at public auction.

5.  Said board is a constitutional agency of the state charged with the administration of a public trust concerning the state lands and is vested with certain discretionary power in the premises.

6.  The state board of land commissioners, under the constitution and law, in the sale of state timber where the land is reserved to the state with the small timber growing thereon, in accepting or rejecting a bid acts *quasi*-judicially and has certain discretion in the matter, and in the absence of manifest abuse of such discretion or fraud its action will not be interfered with by the courts.

7.  *Held,* under the facts of this case that the board did not abuse its discretion.

8.  The state in the sale of its timber, where it retains the land and the small timber growing thereon, and has certain other timber lands surrounding and adjacent to the timber so sold, is financially interested in making the sale of such timber as advantageous to the state as possible.

9.  *Held,* under the law and the facts of this case that the board did not err in accepting the bid made by the Barber Lumber Company.

Original application in this court for a peremptory writ of mandate to the Secretary of State to compel him to countersign and affix the great seal of the state to a certain deed or contract for sale of certain timber standing on land owned by the state.    Writ granted.

A. A. Fraser, for Plaintiff.

A tender by Mr. Snow in payment of his bid was not a sufficient or legal tender.  (*Breed v. Hurd,* 6 Pick. (Mass.) 356; *Blair v. Hamilton,* 48 Ind. 32; *Stakke v. Chapman,* 13 S. D. 269, 83 N. W. 261; *Dungan v. Mutual Ben. L. Ins. Co.,* 46 Md. 469; *Eddy v. Davis,* 40 Hun (N. Y.), 637; affirmed

in 116 N. Y. 247, 22 N. E. 362; *Mills v. Huggins,* 14 N. C. 58.)

The highest bidder at public sales where the purchaser is required to enter into a contract for the performance of subsequent acts is not necessarily the party who bids the most in dollars and cents; the board making the sale have the right to take into consideration the honesty, integrity, financial standing and ability of the different bidders. (*Times Pub. Co. v. City of Everett,* 9 Wash. 518, 43 Am. St. 865, 37 Pac. 695; *Irving Savings Institute v. Robinson,* 35 Misc. 449, 71 N. Y. Supp. 193; *Gray v. Veirs,* 33 Md. 18, 22.)

The great weight of authority is to the effect that the highest bidder at either a judicial or public sale is not, as a matter of law, entitled to the property. (*Knox v. Spratt,* 19 Fla. 817; *Rogers etc. Hardware Co. v. Cleveland Bldg. Co.,* 132 Mo. 442, 53 Am. St. 494, 34 S. W. 57, 31 L. R. A. 335; *Davis v. McCann,* 143 Mo. 172, 44 S. W. 795; *Blossom v. Milwaukee etc. Ry. Co.,* 3 Wall. (U. S.) 196, 18 L. ed. 43; *Anderson v. Wisconsin Cent. Ry. Co.,* 107 Minn. 296, 131 Am. St. 462, 120 N. W. 39, 16 Ann. Cas. 379, 20 L. R. A., N. S., 1133.)

Under the constitution and statutes, the state board of land commissioners constitutes the business agent of the state in disposing of the state lands and timber, and their judgment and discretion will not be interfered with in the absence of fraud. (*Pike v. State Board of Land Commrs.,* 19 Ida. 268, Ann. Cas. 1912B, 1344, 113 Pac. 447; *Douglass v. Commonwealth,* 108 Pa. 559; *Kelly v. Chicago,* 62 Ill. 279; *Hoole v. Kinkead,* 16 Nev. 217; *Interstate Vitrified Brick & Paving Co. v. Philadelphia,* 164 Pa. 477, 3 Atl. 383; *Commonwealth v. Mitchell,* 82 Pa. 343; *State v. McGrath,* 91 Mo. 386, 3 S. W. 846; *People v. Dorsheimer,* 55 How. Pr. (N. Y.) 118; *Clapton v. Taylor,* 49 Mo. App. 117.)

S. L. Tipton, for Defendant.

The state board of land commissioners had no authority to dispose of the timber growing on the lands of the state of

Idaho, for the reason that sec. 1594, Rev. Codes, under which it is assumed to sell the timber, is unconstitutional. Under this section timber growing upon the lands of Idaho may be sold at public sale to the highest bidder upon bids submitted in writing and by this means deprive the state of that competition which a public auction would secure.

"An auction is a sale of consecutive bidding instituted to reach the highest price of the article by inciting competition for it." (*Hibler v. Hoag*, 1 Watts & S. (Pa.) 552; *Kine v. Turner*, 27 Or. 356, 41 Pac. 664.)

The board has no discretion in rejecting the highest bidder, as under sec. 1594 "the timber is to be sold to the highest bidder." (*Gray v. Veirs*, 33 Md. 18.)

The word "highest" is used in order that there should be no sale unless there should be a real competitor. (*Fairfax v. Hopkins*, 2 Cranch C. C. 134, 8 Fed. Cas. No. 4614, p. 955; *Irving Savings Inst. v. Robinson*, 35 Misc. 449, 71 N. Y. Supp. 193.)

SULLIVAN, J.—This is an original proceeding brought in this court for a writ of mandate to Wilfred L. Gifford, as Secretary of State of the state of Idaho, to countersign and affix the great seal of the state to a deed or contract of sale for certain timber standing on land owned by the state, alleged to have been sold to the plaintiff, the Barber Lumber Company, at public auction.

After formal allegations in said complaint to the effect that the Barber Lumber Company is a corporation, etc., and that Wilfred L. Gifford, the defendant, is the duly elected, qualified and acting Secretary of State of the state of Idaho, it is alleged that the Barber Lumber Company made due and legal application in writing to the register of the state board of land commissioners to cut certain trees standing upon about 12,000 acres of land described in said application, belonging to the state; that the Barber Lumber Company had paid all of the costs estimated by the state board of land commissioners as well as all the costs of all other proceedings directed by law to determine whether such trees could be law-

fully cut; that the register of said state board caused the application of said Barber Lumber Company to be published for the full period of thirty days in one or more weekly newspapers having such circulation as would fully advise the water users of the irrigation area upon the water-shed upon which said trees are growing of the pendency of the application, and that protests to the granting of the application must be made within twenty days from the date of the last publication of said notice; that upon the expiration of the time for filing such protests as therein provided, no protests having been made, the state board of land commissioners decided that the trees desired in said application might properly be disposed of and sold; that thereafter said board caused to be advertised in three or more newspapers designated by said board, one of which was published in the county in which such timber is located, for a period of more than four weeks, that said trees would be publicly sold at the State Capitol in the city of Boise on October 25, 1913, to the highest bidder for cash, and that if the highest bidder was some other person than the applicant, he should pay the costs and disbursements incurred by said applicant in the matter of said application; that on said 25th of October, 1913, the said Barber Lumber Company did bid for said trees the sum of $100,000 in cash; that said board took the said bid under advisement and consideration, and on the 25th day of November, 1913, did by unanimous vote of the members of said board decide and declare that said bid of the Barber Lumber Company was the highest and best bid for said trees and did accept the bid of said Barber Lumber Company therefor; that on the 29th of November, 1913, the Barber Lumber Company presented to said defendant, Gifford, as Secretary of State, a deed or contract conveying from said state of Idaho to the said Barber Lumber Company the trees growing upon the said described tracts of land, which said deed or agreement was signed by John M. Haines as governor of the state of Idaho, and requested the said defendant Gifford to attest the same and affix thereto the seal of the state of Idaho, and that said defendant then and there refused so to do and will con-

tinue to refuse to attest the same or attach the seal of the state thereto unless ordered to do so by this court; that the Barber Lumber Company is now ready, willing and anxious to pay to said board the sum of $100,000 in cash, the amount to be paid for said trees, and to comply with all the rules, regulations and orders of said board in relation thereto.

It is also alleged that sec. 16 of art. 4 of the state constitution provides that "All grants and permissions shall be in the name and by the authority of the state of Idaho, sealed with the great seal of the state, signed by the governor and countersigned by the Secretary of State," and that in order to procure a good and sufficient title to said trees so purchased it is necessary for the grant, deed or contract conveying the same to be countersigned by the said Gifford as Secretary of State of the state of Idaho, and that the plaintiff has no adequate or any remedy at law except such relief as may be obtained in this proceeding.

As a reason for presenting this application, it is alleged that if the Barber Lumber Company becomes the purchaser of said trees and procures a good and sufficient title thereto, it expects and intends to construct or have constructed a line of railway from the mouth of Moore's creek up and into the vicinity and neighborhood of the lands upon which said trees are now standing, for the purpose of hauling and conveying the timber upon said lands to the Barber Lumber Company's mill located near Boise, and that to accomplish this purpose it has procured subscriptions from divers and different persons in sums sufficient to enable it to construct said line of railway; that said subscriptions were entered into and made upon condition that said Barber Lumber Company become the owner of and obtain the good and sufficient title to the trees growing upon said tracts of land, and that said subscriptions would expire by limitation of time on January 1, 1914; and it is alleged that the Barber Lumber Company is unable to say under the present state of the financial market whether or not it could procure these subscriptions to be renewed; and for the further reason that the sum of $100,000 paid as aforesaid for said trees belongs to the school fund

of the state of Idaho and that the same can be readily placed at interest immediately at the rate of seven per cent per annum, and that the act of the defendant in refusing to countersign the deed or contract is depriving the school fund of the interest it would obtain during said period of time on said sum of money, and plaintiff prays for a writ of mandate as above stated.

Upon presenting said complaint or petition to this court, the court ordered an alternative writ of mandate to issue, which was done and served upon the Secretary of State, who thereupon made his return to said writ and set forth in said return the entire proceedings of said board of land commissioners, and admitted the facts in regard to the application of the Barber Lumber Company to purchase said trees and the proceedings of the board thereunder substantially as set forth above. Due notice was given of the sale of said trees as required by law, and said board reserved to itself the right to reject any and all bids for said trees and timber growing upon said lands. On October 25, 1913, the date fixed for receiving the bids for the purchase of said trees, the board met and the following is a part of the proceedings of said board:

"This being the date set for receiving bids on the timber on approximately 12,000 acres of land in the Boise Basin, the Board, through its State Land Commissioner, George A. Day, offered the said timber at public sale. There were but two bids, one by Lyon Cobb, acting for the Barber Lumber Company for $100,000, and one by Edwin Snow for parties unknown for $101,000. There being no further bids, it was moved and carried that the Board take the bids under advisement until two o'clock P. M. of this day.

"Board convened at two o'clock P. M. for further consideration of the bids on timber. There was presented at this time an objection on the part of the Barber Lumber Company to the bid of Edwin Snow. Said objection reading as follows:

" 'Counsel for the Barber Lumber Company, the party who made the bid of $100,000 for certain timber in the Boise Basin

at a sale conducted this 25th day of October, 1913, enters his protest to the State Board of Land Commissioners and objects to that body considering any other bid than the bid of the Barber Lumber Company for the reason that there was no other legal bid made at said sale and that no other bid was made at said sale which included the costs incurred by the applicant, Barber Lumber Company, in determining the right to cut the trees upon the lands described in the notice of sale.' ''

Then and there the attorney for the Barber Lumber Company tendered to the board the sum of $100,000 in cashier's certificates, $50,000 on the First National Bank of Boise, Idaho, and $50,000 on the Boise City National Bank of Idaho, and stated to the board that if there was any objection to the offer of the tender on the ground that it was in the shape of certified checks instead of cash, he desired to have the board so signify, and it was then and there stated by the president of the board that the tender was acceptable and sufficient.

Mr. Snow, who represented the unknown parties, thereupon stated that his bid did not include the expenses of ascertaining the amount of timber that would be included in the sale; that the $101,000 bid was for the timber alone and that the parties for whom he was bidding would pay in addition thereto the cost and expense which the applicants for the sale had paid.

Thereupon Mr. Eldridge, a citizen and taxpayer of the state, objected to the new bid of Snow for $101,000 plus the cost of the surveys as provided by statute.

Thereupon the attorney general, who is a member of the board, proceeded to ask the bidders a few questions. He asked Snow if the people he represented and for whom he had bid were willing to contract to construct a railroad up into the said timber and to begin the cutting of the timber. Thereupon Snow replied that his clients were not at that time prepared to enter into any definite agreement regarding the construction of a railroad or the cutting of the timber except under the terms specified in the law and the terms of the sale; that his bid was a business proposition without reference to

any collateral agreements and simply upon a basis of the timber offered for sale, and that his clients were not prepared to enter into a contract to build a railroad or to cut said timber.

The same question was propounded by the attorney general to the representative of the Barber Lumber Company, who stated that at the meeting of the stockholders of the company funds were subscribed to start the mill and build the railroad. Thereupon the attorney general stated as follows:

"One of the moving considerations in the question of the disposition of this timber, as it appeared to me and also to the other members of the board, was the building of the railroad into the Basin, the immediate operation of the sawmill just out here and the consequent activity in this district, and in the state, that would result from such railroad building and opening of the mill. That was one of the prime factors in offering this timber at this time."

After some further suggestions by the attorney general, Fraser and Snow, it was suggested that an adjournment of the matter be had and Snow suggested that he would like at least thirty days if an adjournment was to be had. Thereupon, on motion of the attorney general to the effect that the consummation of the sale and the acceptance of the bids be postponed for a period of thirty days, the board adjourned the matter for thirty days, or to the 25th day of November, 1913, the motion being unanimously carried.

On November 25th the board again convened and the attorney general thereupon asked Snow if the parties whom he represented were prepared to offer any guaranty as to the manufacture and marketing of lumber or the building of a railroad. R. C. Buchanan, one of Snow's clients, answered that he was one of the parties for whom Snow submitted the bid of $101,000 at the board meeting of October 25th, and that was the highest bid, he believed, and his associates should be awarded the timber, and that they should have the right to market the timber to their own advantage, there being no conditions attached at the time the timber was offered for sale, and that he had no other offer to make at that time. In

answer to further questions by the attorney general, Snow stated that at the time the timber was offered for sale on October 25th, and prior thereto, he was familiar with the talk of the building of a railroad and the manufacturing of the timber into lumber and knew it was one of the considerations that the board had in mind in offering the timber for sale. The attorney general stated as follows:

"The Barber Lumber Company has agreed to start the survey of a standard gauge railroad, to be used as a common carrier, within four months and to complete such road within twenty months, up Moore's creek to the mouth of Grimes' creek, and to begin the operation of its sawmill near Boise at as early a date as practicable, and to continue the operation of the mill without cessation for a period of not less than one year after beginning operations, a good and sufficient bond of $75,000 being filed to be forfeited to the state in the event the said Barber Lumber Company does not carry out its agreement.

"In consideration of the greatly increased value that would accrue to the state lands upon which the timber stands, that it is proposed to sell, by the construction of a standard gauge railroad which shall be a common carrier, and by reason of the enhanced value of other state lands and timber in that vicinity and by reason of the increased value of the timber now less than twelve inches in diameter which cannot be cut under the terms of the law and the proposed contract with the Barber Lumber Company, and in consideration of the deposit with the state land board of $100,000 in cash by the Barber Lumber Company, and in consideration of other vast benefits that would accrue to the state and its endowment funds which, in the opinion of the board, would be far in excess of the value of $1,000 offered by Mr. Snow over the Barber Lumber Company, and because there has not been and is not now a tender on the part of Mr. Snow, I move the acceptance of the bid of the Barber Lumber Company."

Thereupon Snow tendered a certified check of $50,000 upon banks in St. Paul, Minnesota, and checks for $51,000, not certified, on banks in Idaho Falls, Idaho.

Fraser, counsel for Barber Lumber Company, thereupon objected to the board's considering the bid made by Snow on October 25th, or at that time, on the ground that it contained no offer to pay the preliminary expense of cruising, surveying and advertising for the sale of said land, as required by law. The attorney general also objected to the offer of the tender by Snow, especially as to the two checks dated November 25, 1913, one for $25,000 and one for $26,000, signed by R. C. Buchanan but not certified. Snow thereupon stated that his clients would tender currency if given time. Governor Haines stated that the board had never made objection to certified checks and that he objected to the bid of Snow because in making his tender no offer to pay the preliminary expense of cruising, surveying, advertising, etc., as provided by law, was made. Snow thereupon said that he wanted the record to show that the highest bidder wants to know the exact cost of the preliminary expenses and offers to pay the said expenses as required by law in addition to this bid of $101,000.

The attorney general moved to reject the bid made by Snow, which motion was based on the ground that his tender was not sufficient; that the personal checks uncertified and the certified checks on banks in Minnesota were not satisfactory to the board and the board rejected said bid for that reason. Thereupon Governor Haines directed the roll called upon the motion of Mr. Peterson that the bid of the Barber Lumber Company be accepted, which motion was carried by a unanimous vote of said board. The bid of the Barber Lumber Company was thereupon accepted.

After setting forth the above facts in the return, the Secretary of State alleges that on account of said proceedings and there being two bids at such sale for the purchase of said timber, and because the bid of Edwin Snow being on its face for a greater amount than the bid of the Barber Lumber Company, and the tender by said Snow of checks certified and uncertified in the total amount of $101,000, and the rejection of said tender and the acceptance of the bid of said Barber Lumber Company for said timber, that some question

now exists on the part of the defendant as to the legality of said sale to the said Barber Lumber Company and of the right of the Secretary of State to countersign and attach the seal of the state to the deed mentioned in the petition, and for that reason the Secretary of State refuses to countersign and seal the same and asks that he may go hence without day.

A general demurrer was filed to the return made by the Secretary of State and the case was presented to this court upon that demurrer, and the question is directly presented as to whether the answer states facts sufficient to constitute a defense or shows any legal cause why the Secretary of State should not attest said deed or contract and attach the great seal of the state thereto.

It is first contended by counsel for the defendant that the state board of land commissioners has no authority to dispose of timber growing on the lands of the state of Idaho, for the reason that sec. 1594, Rev. Codes, under which said board assumed to sell said timber, is unconstitutional, in that it does not provide for a sale at public auction. Said section makes provision for the proceedings of the board on the sale of trees upon state lands, and provides for giving a certain notice and a public sale, which notice was given in this case and a sale at public auction was had. Said section contains, *inter alia*, the following provisions:

"Thereafter said trees shall be publicly sold at the State Capitol, in the City of Boise, or at some other place designated by said board in said notice, to the highest bidder, and if such highest bidder be some person other than the applicant, he shall pay the costs and disbursements incurred by said applicant in the matter of said application, as herein provided," etc.

Land Commissioner Day met with the board at said meeting on October 25, 1913, and proceeded to offer said lands at public auction, and the bids as above indicated were made, so said sale was made in accordance with the provisions of sec. 8, art. 9, of the state constitution, which provides that state lands shall be held in trust "subject to disposal at public auction for the use and benefit," etc. While said section of

the statute does not use the words ''public auction,'' it uses the words ''publicly sold.'' An auction sale is a sale by public outcry to the highest bidder on the spot. This sale was made by public outcry and only two bids were received. It was the clear intention of the legislature to have such sales made at public auction in conformity with said provision of the constitution, and said sale was so made. There is, therefore, no merit in said contention of counsel for the defendant.

It is next contended that said board had no discretion in accepting bids, but that under the provisions of said sec. 1594 the timber must be sold to the highest bidder. This contention involves the extent of the discretion of the board in determining which bid is the highest. Counsel for defendant contends that the state in the sale of its lands is only interested in securing the highest price and in the ability of the purchaser to pay, and cites in support of his contention a number of authorities involving judicial sales of real estate. Counsel also contends that the only object under the law is that the state should receive the highest price for the timber and that the bid of $101,000 being the highest, the board was bound to accept it regardless of any other consideration whatever, or as to what effect such sale might have upon other timber lands belonging to the state in the vicinity where said timber is located.

The grant of lands for the various purposes by the federal government to the state constitutes a trust and the state board of land commissioners is the instrumentality created to administer that trust, and is bound upon principles that are elementary to so administer it as to secure the greatest measure of advantage to the beneficiary of it. To that end and of necessity the board must have a large discretionary power over the subject of the trust. Under sec. 7, art. 9, of the state constitution, the board is given ''direction, control and disposition of the public lands of the state, under such regulations as may be prescribed by law.'' Sec. 8 of art. 9 provides that ''It shall be the duty of the state board of land commissioners to provide for the location, protection, sale or

rental of all the lands heretofore, or which may hereafter be granted to the state by the general government, under such regulations as may be prescribed by law, and in such manner as will secure the maximum possible amount therefor,'' and ''the legislature shall provide for the sale of said lands from time to time and for the sale of timber on all state lands and for the faithful application of the proceeds thereof in accordance with the terms of said grants.''

The legislature has provided regulations for the control and disposition of such lands and the statute law in regard thereto is found in Revised Codes, sec. 1558 et seq., and the amendments to the various sections contained in said law. Sec. 1558, after naming the members of the board, provides that the board shall have direction, control and disposition of the public lands of the state, and is given power to manage and control the same to the best interests of the state under the law. Said board is a constitutional agency charged with the administration of a public trust and is vested with certain discretionary power in that behalf, and its discretion is invoked whenever it is called upon to ''confirm or reject a sale or determine what bid for land is the highest,'' and so long as the board is faithfully performing its duties under the law in the exercise of its discretion, this court has no authority to interfere and adjudge a sale of timber or land illegal or void, unless fraud appears in the sale or a clear abuse of its legal discretion is shown. The board in accepting or rejecting a bid for state timber or land acts *quasi*-judicially, and in the absence of manifest abuse of that discretion the courts will not interfere.

The supreme court of Montana in the case of *State ex rel. Gravely v. Stewart* (Mont.), 137 Pac. 854, had under consideration the question of the extent of the discretion of the board of land commissioners of that state, and in that opinion the court said:

''  . . . . and the state board of land commissioners, as the instrumentality created to administer that trust, is bound, upon principles that are elementary, to so administer it as to secure the largest measure of legitimate advantage to the

beneficiary of it. To that end, and of necessity, the board must have a large discretionary power over the subject of the trust.''

Under the statutes of this state, said board is given a large discretionary power in the exercise of the trust.

Now, if we apply the rules of law above enunciated to the facts of this case, it is clear that the state board has acted in this matter only as a man of good business sense and judgment would act in regard to his own affairs. The board had two bidders at said auction sale for said timber, the state retaining the land on which said timber was situated, and it had much other land in the vicinity of said timber, and the state's land, no doubt, would be greatly enhanced in value by the construction of a railroad into the other timber lands of the state. And, too, the construction of a railroad not only will greatly enhance the value of other state lands in the neighborhood of such railroad, but will also add greatly to the value of the taxable property of the state, and if this were a private transaction, upon that state of facts, how would any business man of good sense and judgment, occupying the position of the state, do otherwise than accept said bid of $100,000 for said timber, when evidently such bid would result greatly more to the financial benefit of the state than $1,000? The value of the other state lands in that region of country would be increased many thousands of dollars by reason of the construction of the railroad, and the value of said railroad for taxable purposes, when completed, would amount in a single year to a great deal more than said $1,000. And again, the young timber standing on the land that measures less than twelve inches in diameter eighteen inches from the ground is to be carefully protected under said contract of sale, as the state owns the land and all such timber. Much of the timber on said land is already ripe and the removal of it from the land will no doubt be a benefit to the young timber left standing.

Taking all of these matters into consideration, the board was fully justified in rejecting said bid of $101,000 and accepting the bid of $100,000, but such rejection was not based primarily

on said considerations. The land business of the state placed in the hands of the state board of land commissioners ought to be conducted on business principles so as to subserve the best interests of the people of the state.

The board was fully justified in rejecting the bid of Snow, for the reason that the sale was advertised as a cash sale and certified checks for $50,000 of the price offered were on banks in Minnesota, and $51,000, not certified, were on banks in a distant part of the state, and had the board accepted them, before the money could have been collected on them, the banks might have failed. The bid of the Barber Lumber Company was based on two certified checks on the leading banks of Boise City, only a few blocks from the State House where the board meeting was held, and the agent of the Barber Lumber Company stated to the board that if such checks were not satisfactory, within a few minutes' time he would produce the cash and present it to the board, but the chairman of the board stated that certified checks were satisfactory, thereby intimating that uncertified checks were not.

In the case of *Pike v. State Board of Land Commrs.*, 19 Ida. 268, Ann. Cas. 1912B, 1344, 113 Pac. 447, the court said:

"In the first place, the constitution vests the control, management and disposition of state lands in the state board of land commissioners. (Sec. 8, art. 9.) They are, as it were, the trustees or business managers for the state in handling these lands, and on matters of policy, expediency and the business interest of the state, they are the sole and exclusive judges so long as they do not run counter to the provisions of the constitution or statute."

Now, if the state had no further interest in the matter and no further lands that would be in any wise affected, regardless of who the purchaser was, and the state was only interested in getting all the money possible for the timber sold, then a different rule might apply; but where the state is vitally interested in having the ripe timber taken off at as early a date as practicable, and in protecting the young timber, the financial interest of the state ought to be consid-

ered in a way at least that an ordinarily prudent business man would consider and conduct his own private affairs.

The state in the sale of its timber, where it retains the land and has other lands surrounding the timber sold, is financially interested in making the sale of such timber as advantageous to the state as possible and to responsible parties.

Another cogent reason for rejecting the bid of Snow is that the board had a right to know who the persons were for whom he was making the bid. He declined to give their names, but finally at the adjourned meeting he gave the name of one, a Mr. Buchanan, but the associates of Mr. Buchanan were not made known to the board even at the adjourned meeting, so far as the record shows.

As before stated, the state was vitally and financially interested in the growth of the young timber that was to be left standing upon said land, and it was the duty of the board, under the circumstances of this case, to carefully guard the interests of the state in that regard and not sell the timber to irresponsible people or people who were not financially able to respond in damages resulting to the state from their failure to carry out their contract with the state in protecting the young timber, and burning or otherwise disposing of the tops and limbs of the trees cut, in a proper manner.

The Barber Lumber Company had several hundred thousand dollars' worth of property located in the state and were evidently responsible for carrying out those provisions of the law embodied in the contract. On such a deal, a thousand dollars, or one per cent of the purchase price, was not a sufficient advance over the bid made by the Barber Lumber Company to compel the board to accept it, in view of the fact that the board did not know whether such bidders were financially responsible for any damages that might result to the state from their negligence by fire or otherwise in protecting the state's interest in the timber to be left on said land, or the state's interest in land adjoining the same. In this case it was the duty of the board to get the highest cash price possible for the timber when taken into consideration with the

other interests of the state closely connected with the sale of the timber, as above stated.

It is true, a bond is required for the faithful carrying out of the contract for the sale of the timber, but the board has the right to consider the character, reputation and ability of the parties to contract to carry it out without resorting to what might be a doubtful action on the bond to recover damages.

From all of the facts in this case, it is clear that the board did not exceed its discretion in making said sale, and as held in *Pike v. State Board of Land Commrs., supra,* said board is the trustee or business manager for the state in making the sale of said timber and on matters of policy, expediency and business interest of the state, they were the sole and exclusive judges, so long as they did not run counter to the provisions of the constitution or statute and no fraud was shown.

Under the law and the facts of this case, the board had the discretionary power to reject the bid made by Snow and accept the bid made by the Barber Lumber Co.

We therefore conclude that the sale was a legal sale made under the provisions of the constitution and the law, and that the peremptory writ of mandate must issue directing the defendant as Secretary of State to countersign said deed or contract of sale and attach the great seal of the state thereto, and that the demurrer should be sustained.

No costs are awarded in this case.

Stewart, J., concurs.

BRYAN, District Judge, Dissenting.—I am unable to agree with the conclusions reached in the majority opinion.

In the first place, it is contended by counsel for plaintiff, which contention is adopted in the majority opinion, that the bid of Snow should not have been received on account of the insufficiency of the tender made by him. The following is an excerpt from the official record of the proceedings of the land board covering the sale in question: "This being the date set for receiving bids on the timber on approximately 12,000

acres of land in the Boise basin, the board, through its State Land Commissioner, George A. Day, offered the said timber at public sale. There were but two bids, one by Lyon Cobb, acting for the Barber Lumber Company, for $100,000, and one by Edwin Snow, for parties unknown for $101,000. There being no further business it was moved and carried that the board take the bids under advisement until two o'clock P. M. of this day.''

It will be observed that at the time of the sale no objection was made by any member of the board, nor by any other person, to the bid of Snow, for the reason that cash did not accompany the bid. In the afternoon of said day, pursuant to adjournment, the board met, and at length considered the two bids before it. The official record discloses that at no time during this meeting did the board or any person make any objection to the bid of Snow because cash was not presented before the board. At the conclusion of this meeting the board took an adjournment for thirty days to consider the two bids. Thirty days later, to wit, on the 25th day of November, the board met and considered both bids at great length, and at no time, until the deliberations had practically closed, was any objection made by the board or any member thereof to the sufficiency of the tender of the bidder Snow. In fact, no hint was ever given Snow that the board or any member excepted to his bid on account of his failure to place the cash before the board until the motion was made to accept the bid of the plaintiff company, when the mover included in his motion the words, ''and because there has never been, and is not now, a tender on the part of Mr. Snow.''

The record shows that at this point Mr. Snow tendered certified checks in the sum of $50,000, and uncertified checks in the sum of $51,000 on Idaho banks, and simultaneously stated to the board that the checks were used as a matter of convenience, and if given time he would bring the currency before the board. Notwithstanding this offer the board by motion rejected the bid of Snow and accepted the bid of the plaintiff company in the sum of $100,000, the same being $1,000 less than the bid of Snow.

Owing to the fact that during all the deliberations up to the last act of the board in accepting the bid of the company, no objection was made to the bid of Snow, because of his failure to produce the cash, and owing to the fact that he (Snow) offered, if given time, to procure the actual cash, and also to the further fact that it had been the custom of representatives of the land board to accept checks in payment for land in various sales throughout the state, and owing to the further fact that the only tender made by the plaintiff company was in certified checks, I think the bidder Snow was entirely justified in assuming his tender would meet the requirements of the board, even if a portion of the amount was in uncertified checks on banks in the state of Idaho. I can find nothing in the record which indicates that the board was not willing to accept these checks until after the bidder submitting them had declined to perform conditions imposed by the board subsequent to the sale, which conditions are not provided for by the law, nor were they made a part of the notice of sale. I cannot agree that under the law the board was justified in refusing the bid of Snow because he and his clients declined to obligate themselves to perform such conditions.

Another question raised upon the argument is, whether the board was justified in rejecting the bid of Snow, for the reason that it did not in terms include the expense incurred by the applicant in determining the right to cut the trees upon the lands described in the notice of sale. Sec. 1594, Rev. Codes, provides, *inter alia,* "and if such highest bidder be some person other than the applicant, he shall pay the costs and disbursements incurred by said applicant in the matter of said application, as herein provided, the amount of which shall be determined by the board or by the person designated by the board to make such sale . . . . and no bids shall be received which do not include the costs incurred by said applicant in determining the right to cut the desired trees." This statute provides the amount of these expenditures shall be determined by the board or by the person who makes the sale. Inasmuch as the board designated another to make the

sale, the law imposed upon him the duty of ascertaining the amount of such expenditure. The record shows that on the day of the sale, and while both bids were being considered, Snow stated in effect that it was his understanding that as a matter of law when his bid was made, the amount of expense incurred in cruising, etc., would be automatically added, and he further stated, "that when that amount is ascertained, it may be noted as the amount which will be paid by us to reimburse the parties who are the applicants for the sale," in addition to the $101,000 to be paid for the timber. It will be noted this statement was made by Mr. Snow to the board while in session and considering both bids, and one month before the board assumed to exercise its discretion and reject his bid, assigning as one reason for such action that Snow's bid did not include this preliminary expense. Furthermore, the record made a part of the return in this case does not show that at any of these various meetings the bidder was advised as to the amount of the expense, or where the same could be ascertained, until near the end of the final meeting, and after the motion to accept the bid of the plaintiff company had been made and seconded. If it was competent for the plaintiff company one month later to add to its bid conditions subsequently imposed by the board, I am unable to see how the bid of Snow could be held void because it did not specifically state these preliminary expenses were included, when any possible ambiguity was removed by him on the day of the sale. It will thus be seen that while the matter was still pending and undetermined, Mr. Snow effectually cleared up any possible ambiguity that might have existed as to whether his bid included this preliminary expense, and stated to the board that his bid should be considered as covering such expense. This was at a meeting thirty days prior to the one in which the plaintiff company agreed to perform the additional conditions required by the board, and at which last-named meeting the bid of Snow was finally rejected, and the bid of the plaintiff company was accepted.

The next question presented is whether in a case of this kind the board is clothed by law with a discretion to reject a higher

bid and accept a lower one, by reason of the lower bidder agreeing to perform conditions not provided for by law nor covered by the notice of sale. It may be assumed that in this particular case more benefit might accrue to the state, and particularly to the locality in which the timber is located by a sale to the plaintiff company, than the value of the difference between the bids; however, in determining this question, this court is announcing a rule of law which is to be the established policy of the state in all cases of this character for all time to come. For this reason, I do not believe the circumstances of this particular case should have any weight in determining this important question. We are dealing here with a strictly legal proposition under the constitution and statutes of the state. Sec. 7, art. 9 of the constitution, quoted in the majority opinion, puts the direction, control and disposition of the public lands in the hands of the land board under such regulations as may be prescribed *by law.* Sec. 8 of art. 9 of the constitution asserts: "It shall be the duty of the state board of land commissioners to provide for the location, protection, sale or rental of all the lands heretofore, or which may hereafter be, granted to the state by the general government, under such regulations as may be prescribed by law, and in such manner as will secure *the maximum possible amount therefor.*" These sections of the constitution are exclusive, and in my judgment admit of but one interpretation. No hint there that the state's land or timber can be disposed of under regulations prescribed by the state land board or any co-ordinate branch of the state government except the branch charged by the constitution with the making of the law. Sec. 1594 of the Rev. Codes provides: "Thereafter said trees shall be publicly sold at the State Capitol, in the city of Boise, or at some other place designated by said board in said notice, to the *highest bidder.*" Under these positive declarations of the constitution and statutes, I cannot agree that the state land board has discretion to give public notice that it will sell this timber to the highest bidder for cash, with no conditions attached, then after the sale has been concluded, impose conditions unknown to the constitution and

the law, then reject the higher bid and accept a lower one, because of the failure of the higher bidder to comply with such conditions. The majority opinion asserts, in effect, that the state land board in exercising its discretion in this matter has acted only as a man of good business judgment would act in regard to his own affairs. However, I am convinced that there is a wide difference between the position of the land board and that of an individual transacting his own private affairs. The latter has unquestioned right to dispose of his own property as he sees fit. In such matters he is a law unto himself. In the handling of his own business affairs he is amenable to no law so long as he does not encroach upon the rights of society or of his fellow-men. On the contrary, the duties and powers of the land board are circumscribed by the inflexible mandate of the constitution, that it must dispose of the public lands of the state "in such manner as will secure the *maximum possible amount therefor,*" and also the statutory law that these trees shall be sold at some place designated by the board to the *highest bidder.*

I cannot therefore agree that the board had discretion to reject a higher bid and accept a lower one on account of the fact that accepting the lower bid might indirectly enhance the value of the state's holdings in the particular locality, and also benefit other enterprises in that region, in which the state has no interest. With a parity of reasoning it might be argued that the board could exercise such discretion in the sale of any public patrimony of the state, dependent upon the use to be made by the purchaser of the land or timber, after the consummation of the sale. I do not believe the board possesses such authority.

Counsel for plaintiff has cited numerous cases showing that a public board has some discretion in the matter of letting contracts for public works, etc. I assume such to be the established law of the country; however, in the letting of contracts for public works, all conditions of the contract remain yet to be performed, and it is of course to the interest of municipalities, etc., to see that every contractor is able to perform the work as per specifications. I do not believe these cases

apply here, for the reason that in this case the sale is outright, and nothing remains to be done to complete the sale, except to pay the price.

The majority opinion asserts that the board should be given discretion in determining to whom the sale should be made, for the reason that the law requires the successful bidder to give a bond, guaranteeing that the state's interests will be protected in the locality where the timber is situated. The record shows that at none of the meetings in which the bids were being considered was the matter of the bond ever mentioned. I do not believe it could be assumed that a bidder who was able and willing to pay $101,000 for the timber in controversy would be unable to give satisfactory bond for the protection of the state's interests in the remaining timber. At any rate, the matter of giving the bond was never discussed between the board and the bidder Snow, or his client, and there is nothing whatever to indicate that the board rejected the bid because the said bidder was unable to give a bond satisfactory to the state.

I think the allegations of the answer constitute a defense to this action, and that the demurrer should be overruled. I dissent.