(No. 6325.   May 27, 1936.)

STATE WATER CONSERVATION BOARD OF THE STATE OF IDAHO and DOROTHY JENNY, Plaintiffs, v. MYRTLE P. ENKING, Treasurer of the State of Idaho, Defendant.

[58 Pac. (2d) 779.]

T. L. Martin, Sidman I. Barber and R. B. Scatterday, for Plaintiffs.

Bert H. Miller, Attorney General, and Ariel L. Crowley, Assistant Attorney General, for Defendant.

James R. Bothwell, Walters, Parry & Thoman and O. R. Baum, *Amici Curiae.*

AILSHIE, J.—This is an original mandamus proceeding prosecuted by the State Water Conservation Board and one of its employees to compel the State Treasurer to pay a warrant drawn upon the fund appropriated by chap. 60 of the 1935 First Extraordinary Session Laws, which created the Board and prescribed the duties and purposes for which it was created.

The State Treasurer has answered the petition by alleging that the act is unconstitutional. It is contended by the Attorney General, who represents the Treasurer, that the act

violates the following enumerated provisions of the state constitution: Art. 1, secs, 2, 18, 21; art. 3, secs. 16, 19; art. 4, secs. 9, 18; art. 5, sec. 13; art. 7, secs. 2, 11, 13; art. 8, secs. 1, 2; art. 9, sec. 7; art. 11, secs. 2, 12, 15; art. 15, secs. 2, 3, 4, 5.

It appears that the members of the Board have been appointed and the Board has been organized and has held meetings and performed some preliminary work.

Our examination of the questions presented satisfies us that it will suffice, for the purposes of this opinion, to consider only the predominant issues which confront us in this case. Defendant has questioned the procedure pursued by the plaintiffs herein but we have not deemed it important to consider or pass upon those questions in this case.

It is contended by the Board that it "is an administrative arm or instrumentality of the state—not a corporation; and especially not a corporation within the purview of Art. 3, Sec. 19 or Art. 11, Sec. 2, of the Constitution." Counsel argue that the "Board" is a mere department of the state devoted to the discharge of "purely governmental functions."

The defendant, State Treasurer, on the other hand contends that the act is an attempt to create a corporation in violation of sec. 2, art. 11, and also in violation of paragraph 31 of sec. 19, art. 3 of the Constitution, which prohibits the legislature from "creating any corporation." Defendant also insists that the powers conferred on the Board are not governmental. An examination of the act (chap. 60, 1935 First Extra. Sess. Laws, p. 162) will disclose whether the powers and immunities conferred upon the Board, which is named as the "State Water Conservation Board" and is designated by the act as "Board," are governmental and administrative powers or are proprietary and corporate powers. To that end we must analyze the act which is entitled as follows:

"An act providing for the creation of the State Water Conservation Board, prescribing its powers and duties, providing for the construction, operation and maintenance of a system of works for the conservation, development, storage, distribution and utilization of water, and for the acquisition of property necessary therefor, authorizing the issuance of water conservation revenue bonds of the state payable solely

and exclusively from the revenues of such works and the funds received from the sale or disposal of water and from the operation, lease, sale or other disposition of the works, property and facilities to be acquired out of the proceeds of such bonds; providing for a lien upon bond proceeds; providing for trust indentures; providing for the creation of certain funds in connection with this act; providing for contracts with the United States; declaring that no debt of the state shall be incurred in the exercise of any of the powers granted by this act; providing for purchase, condemnation and otherwise acquiring land and water rights and for the sale thereof; making an appropriation and declaring an emergency."

Section 1 declares that the public welfare demands the doing of the things subsequently provided for in the act and that "the State Water Conservation Board hereinafter created shall be regarded as performing a governmental function in carrying out the provisions of this Act."

The act is too voluminous to set out at length herein and for that reason we will only refer specially to some of its outstanding terms. It creates a Board of which the Governor is chairman and whose members he appoints, and provides a method of filling vacancies so that the Board as such may continue in perpetuity, and authorizes the adoption of a common seal, bearing the name of the Board of which "all courts shall take judicial notice." It also authorizes the Board to adopt from time to time, as necessary or expedient, suitable rules and regulations for the administration of the act, and to appoint such technical and other assistants, employees, engineers, attorneys and others, as may be deemed necessary to enable it to perform its duties and carry out the purposes of the act.

It further provides that "The Board shall have power to acquire by purchase, exchange or otherwise, upon such terms and conditions in such manner as it may deem proper, and to acquire by condemnation in accordance with and subject to the provisions of any and all existing laws applicable to the condemnation of property for public use, any land and water rights appurtenant thereto, easements, and other property

deemed necessary or proper for the construction, operation and maintenance of such works." It authorizes the Board to construct reservoirs, dams, diversion canals, distributing canals, lateral ditches, improvement of natural stream channels, construction of by-passes, drilling or digging wells or sumps, acquisition by purchase or condemnation of all lands, easements and franchises; and to exercise any general powers not enumerated in the act, and authorizes borrowing money and securing the same by mortgages and bond issues in amounts limited only by their discretion extending for a period of as long as 40 years. It authorizes the Board "to pledge all or any part of the income, profit and revenue of such works or project, and all moneys received from the sale or disposal of water, water storage, and from the operation, lease, sale or other disposition of all or any part of such works or project, and to covenant to pay such income, profit and revenue into the appropriate Water Fund and Sinking Fund." The Board is especially empowered to enter into agreements with the United States or any of its agencies, either to secure funds from the government or to cooperate with the government, in water conservation and reclamation projects, and to that end to issue its 40-year amortized bonds which the act declares "shall have and are hereby declared to have all the qualities and incidents of negotiable instruments under the Negotiable Instruments Law of the state." We will refer specially to other provisions deemed pertinent in course of our discussion of the question presented.

■■ The power conferred on the Board to issue coupon bonds without limit as to amount and to run for a period of forty years cannot be the exercise of a sovereign or a governmental power, for the reason that it violates sec. 1, art. 8 of the constitution, which prescribes the debt limit and requires the legislature before the creation of any such debt or liability to provide for submission of the question to a vote of the people if the total state indebtedness has reached the specified debt limit; and to provide ways and means, exclusive of loans, for the payment of interest and principal. In like manner it violates sec. 3 of art. 8 of the Constitution, if it be contended that the Board as created by the act is a mu-

nicipal or *quasi*-municipal organization of the kind or character therein designated. If on the other hand the Board here created is not an arm or agency of the state engaged in governmental and administrative business, then its powers must be corporate, either conferred by special act in violation of paragraph 31 of sec. 19, art. 3 of the Constitution, which provides that ''The legislature shall not pass local or special laws in any of the following enumerated cases, that is to say, . . . . creating any corporation''; or else it offends against sec. 2, art. 11, which provides that

''No charter of incorporation shall be granted, extended, changed or amended by special law, except for such municipal, charitable, educational, penal, or reformatory corporations as are or may be, under the control of the state; but the legislature shall provide by general law for the organization of corporations hereafter to be created; provided, that any such general law shall be subject to future repeal or alteration by the legislature.''

It is not a *municipal* corporation nor is it a *charitable, educational, penal* or *reformatory corporation*.

Notwithstanding the declaration of the act that the ''Board hereinafter created shall be regarded as performing a governmental function in carrying out the provisions of this Act,'' it proceeds at once to confer upon the Board as unlimited and plenary powers as the most ambitious private business corporation could wish to exercise. Among those powers are:

1. Power of perpetual succession.

2. Power to sue and be sued.

3. Power to purchase and to take grants of real and personal property and dispose of the same in its corporate name.

4. To adopt and use a corporate seal of which the courts shall take judicial notice.

5. Adopt rules and regulations.

6. To issue and negotiate negotiable coupon bonds.

7. To exercise all the sovereign powers of eminent domain.

In *Jackson v. Gallet,* 39 Ida. 382, 391, 228 Pac. 1068, this court held an act to be in conflict with art. 3, sec. 19 of the Constitution. There the court said the board

"has the essential attributes of a corporation as well as all of the ordinary powers and privileges of a corporation. It has perpetual succession, has a common seal, is authorized to receive gifts and bequests designed to promote the objects for which it is created and the betterment of conditions surrounding the practice of law. It has power to make rules. . . . . It will be conceded that the ordinary powers of a corporation are (1) perpetual succession, (2) to sue and be sued, (3) to receive and to grant by its corporate name, (4) to purchase and to hold lands and chattels, (5) to have a common seal, and (6) to make by-laws."

The act under consideration confers all the corporate attributes (and many more) enumerated in *Jackson v. Gallet* with the additional unlimited power to issue negotiable bonds that may run for a period of forty years; while on the contrary the act considered in *Jackson v. Gallet* conferred many more governmental powers than are to be found in the act here under review.

It has been suggested that the Board is not a private business corporation in that it has not been granted all the powers and attributes of such a corporation. For the purpose of our present consideration it is immaterial whether the Board has been vested with *all the powers* which pertain to a private business corporation created under the general laws of the state (sec. 29–114, I. C. A.), for the reason that the legislature, as we have seen, is prohibited creating such a corporation by special act. It is important, however, to consider *what* corporate powers the legislature has endeavored to confer in order to definitely determine whether it was exercising powers which the fundamental law has declared it does not possess. The legislation is no less unconstitutional because perchance it did not attempt to endow the Board with power to issue shares of stock or admit members or confer upon it the power to dissolve itself. However, no one may assert with assurance that this act does not carry within its numerous grants of power the essentials which might well be compounded into the supposedly lacking corporate ingredients. It is granted authority to admit "projects" into the general scheme and determine their respective interests and benefits

and declares a ''project'' a single works unit (sec. 1 of the act) ; it may voluntarily dispose of all its property and the legislature may dissolve it. So it seems to be lacking in none of the usual corporate powers.

██ Section 15 of the act, entitled ''Powers and Duties of Board,'' furnishes conclusive evidence that the Board so created cannot be ''performing a governmental function'' of the state in the exercise of the powers conferred by that section, for the reason that it runs directly counter to sec. 3, art. 15, of the Constitution, which provides among other things that

''The right to divert and appropriate the unappropriated waters of any natural stream to beneficial uses, shall never be denied, except that the state may regulate and limit the use thereof for power purposes,'' etc.

Section 15 of this act provides:

'' . . . . the Board shall have the right to appropriate any of the unappropriated waters of this state in the method provided by law.''

The section says *inter alia:*

''The Board shall have power to institute in any of the Courts of this state, or in any other state, or in any of the Federal Courts of this state or any other state, any actions, suits, and special proceedings necessary to enable it to acquire, own, and hold title to lands for dam sites, reservoir sites, water rights, rights of way or diversion and distributing canals, and lateral ditches, and other means of distribution of water, and may also in all said Courts institute, maintain, and prosecute to final determination any and all actions, suits and special proceedings necessary to have the unadjudicated water rights adjudicated upon any stream or source of water supply from which is derived the water for such reservoir, diversion and distributing canals, lateral ditches and other means of distribution of the water; and said Board may join any and all owners of waters theretofore appropriated by any person, association or corporation from any of the streams of the State of Idaho, so that adjudication may be had of all unadjudicated water upon all the streams and sources of water supply of any project so con-

structed by said Board. In all such actions, suits or special proceedings, costs shall be awarded by the Court as provided by statute."

Now it is clear that this attempts to authorize the Board to appropriate any or all the unappropriated public waters of the state, and thereby to withdraw them from private appropriation by any person who may desire to comply with the Constitution and statute in the diversion and appropriation of public waters. By this act the Board may rise superior to a settler or land owner in withdrawing waters from diversion and use and the settler be thereby forced to ultimately pay arbitrarily fixed water rates for the use of water he might otherwise have been able to personally divert and apply to a beneficial use. In addition to authorizing the Board to withdraw unappropriated water from private appropriation, this act also authorizes the Board to *condemn private water* rights for the purposes of carrying on the proposed enterprises the act contemplates. (Sec. 4.) We are not discussing what the Board is actually doing, but rather what the act authorizes it to do. (*Boise-Payette Lumber Co. v. School Dist.*, 46 Ida. 403, 268 Pac. 26; *Atkinson v. Board of Ada County Commrs.*, 18 Ida. 282, 108 Pac. 1046, 28 L. R. A., N. S., 412.) If the Board is merely an arm of the state performing "governmental functions," it cannot, in face of these constitutional provisions be authorized to withdraw from private appropriation the unappropriated waters of the state. In other words, the state cannot by legislative act authorize its own agency to *monopolize or withdraw the very rights that sec. 3 of art. 15 of the Constitution says "shall never be denied" the people of the state.* (*State v. Twin Falls etc. Water Co.*, 30 Ida. 41, 67, 166 Pac. 220.)

The people of Idaho in adopting the Constitution thought it a matter of primary importance that they insert in the fundamental law of the state an express prohibition against the legislature ever, by any kind of legislation, taking away from the humblest settler the right "to divert and appropriate" any of "the unappropriated waters of any natural stream to beneficial users." (Sec. 3, art. 15, Const.) The legislature cannot circumvent or thwart that purpose by

creating either a state agency or a special corporation and vesting it with power to *appropriate and sell* the unappropriated waters of the state (sec. 15 of the act) or condemn waters already appropriated (sec. 4). Of course a corporation may appropriate unappropriated waters in the manner provided by statute; but as we have above seen the legislature has no power to create such a corporation by special law. That must be done under general laws. (Sec. 2, art. 11, Const.)

■ It is argued by counsel for the Board that notwithstanding its claim to be only an arm or agency of the state the *debts and liabilities it creates will not be state debts or liabilities* but merely charges against the special funds the Board is authorized to raise and the property it may acquire. This contention is made on the strength of the statement contained in the act that,

"The Board is hereby authorized to provide, by resolution, at one time or from time to time, for the issuance *of Water Conservation Revenue Bonds of the State* for the purpose of paying the cost as hereinabove defined of any one or more such works, the principal and interest of which *bonds shall be payable solely from the special fund herein provided for such payment*. Such bonds shall mature at such time, or times, not more than forty (40) years from their date, or dates, as may be fixed by such resolution, but may be made redeemable before maturity at the option of the state, to be exercised by the Board, at such price, or prices, and under such terms and conditions as may be fixed by the Board prior to the issuance of the bonds." (Sec. 6.)

Paragraph (d) of sec. 8 of the act imposes the duty on the Board:

"To covenant to fix and establish such prices, rates and charges for water and other services made available in connection with such works or projects so as to provide at all times funds which will be sufficient (1) to pay all costs of operation and maintenance of such works or project together with necessary repairs thereto and (2) to meet and pay the principal and interest of all such bonds as they severally become due and payable and (3) to create such reserves for the

principal and interest of all such bonds and for the meeting of contingencies in the operation and maintenance of such works or project as the Board shall determine; and to make such further covenants as to such prices, rates and charges as the Board shall determine.''

Though disclaiming *state* liability it is clearly the intention of the act to place the credit of the state, morally and in some degree financially, back of this enterprise which brings the act unmistakably within the condemnation of the Constitution as construed by this court in *Feil v. Coeur d'Alene*, 23 Ida. 32, 12 Pac. 643, 43 L. R. A., N. S., 1095; *Miller v. City of Buhl*, 48 Ida. 668, 284 Pac. 843, 72 A. L. R. 682; *Straughan v. Coeur d'Alene*, 53 Ida. 494, 24 Pac. (2d) 321. Whether it is intended that the state shall eventually pay any part of the debt or the Board shall pay it out of a special fund, it is certain that the legislature proposes to start the Board off with a $50,000 appropriation (sec. 17 of the act) from the state treasury and that this so-called agency of the state is authorized to ''create'' a ''debt or debts, liability or liabilities'' (sec. 1, art. 8, Const.) which *somebody, some agency* or *some fund must eventually pay;* and that, *under the authority, command and administration of this Board.*

If it be contended that this $50,000 appropriation is merely a loan to be repaid to the state, then it runs counter to sec. 2 of art. 8 of the Constitution, which provides, ''The credit of the state shall not, in any manner, be given, or loaned to, or in aid of any individual, association, municipality or corporation,'' etc. (*Atkinson v. Board of County Commrs.*, 18 Ida. 282, 108 Pac. 1046, 28 L. R. A., N. S., 412.)

As further evidence that the legislature intended to confer corporate powers, it will be observed that the act authorizes the Board to appoint its own secretary and treasurer who are not required to be members of the Board, which indicates that it was intended that the Board should handle its own finances, audit and allow its bills and act independently of the State Board of Examiners, as constituted by sec. 18, art. 4 of the Constitution. If the Board is a mere arm of the state, performing governmental functions only,

then of course all its claims would have to be examined and approved by this constitutional body, the Board of Examiners. (*Bragaw v. Gooding*, 14 Ida. 288, 292, 94 Pac. 438; *Epperson v. Howell*, 28 Ida. 338, 344, 154 Pac. 621; *Gem Irr. Dist. v. Gallet*, 43 Ida. 519, 253 Pac. 128.)

The act calls the bonds "*Water Conservation Revenue Bonds of the State*" and says they shall be "payable solely from the special fund herein provided for such payment." Nevertheless it then proceeds to impose the duty upon the Board to fix "prices, rates and charges for water and other services" to raise *sufficient funds to pay the debts.* (Sec. 8, subsec. d.) The public in whole or in part would have to pay the bills. After authorizing the Board to acquire various kinds of property by purchase or condemnation, to mortgage and encumber the same, to make and float bond issues, the act then says (sec. 12):

"The Board is empowered to sell or otherwise dispose of any rights of way, easements or property when it shall determine that the same is no longer needed for the purposes of this Act, or to lease or rent the same or to otherwise take and receive the income or profit and revenue therefrom."

If it is intended that the property acquired by the Board acting as a "governmental function" shall become state property, then it may well be said that the legislature has no power to divest the State Board of Land Commissioners of the "control and disposition of the public lands of the state" (sec. 7, art. 9), or of the right of "protection, sale or rental" of state lands. (Sec. 8, art. 9, Const.; *Balderston v. Brady*, 17 Ida. 567, 107 Pac. 493; *Pike v. State Board of Land Commrs.*, 19 Ida. 268, 113 Pac. 447, Ann. Cas. 1912B, 1344; *Barber Lumber Co. v. Gifford*, 25 Ida. 654, 669, 139 Pac. 557; *East Side Blaine County L. Assn. v. State Board of Land Commrs.*, 34 Ida. 807, 198 Pac. 760.)

This act places no limitation upon the discretion of the Board in acquiring water rights, lands, reservoir sites, dam sites, easements and real and personal property generally. Neither does it place any limitation except the "discretion of the Board" upon the amount of indebtedness it may incur or the amount of bonds it may issue or the period of time

(not exceeding 40 years) the bonds may run, and grants to the Board unlimited power of employing agents, servants and employees, gives it the right to prosecute and defend actions in all the courts both *state and federal* and *in any state,* confers upon it the right to execute mortgages and trust deeds and to give and take leases (sec. 15) and to sell and dispose of the same.

It is further contended that the powers here conferred on the Board are similar to and no greater than those conferred on the State Land Board (Rev. Codes, sec. 1613) and subsequently the Department of Reclamation (I. C. A., sec. 65-3201, subd. 2), in acquiring public domain and procuring the construction of reservoirs and canals for the reclamation of arid lands under the Carey Act. In support thereof counsel cite *Bothwell v. Bingham County,* 24 Ida. 125, 132 Pac. 972; 237 U. S. 642, 35 Sup. Ct. 702, 59 L. ed. 1157; *State v. Twin Falls etc. Water Co.,* 30 Ida. 41, 166 Pac. 220. It only requires a mere casual examination of these cases and the statutes there considered to disclose the total dissimilarity of the statutes considered in those cases to the one here under consideration. Under the statute accepting the benefits of the Carey Act (1895 Sess. Laws, pp. 215-223; also sec. 41-1701, I. C. A.) the state only acted as an agent and trustee through which the title to the land passed from the United States to the settler and the State Land Board in conjunction with the Secretary of the Interior simply determined when the terms of the Carey Act grant had been complied with and passed title accordingly. (28 Stats. at Large, 422.) There application to appropriate unappropriated waters was duly made and contracts were entered into by private corporations for the construction of dams, diversion works and canals; and the act of Congress and the contracts thereunder granted the construction companies liens on the lands and works for their pay for constructing the works, and the state agents and the federal agents were charged with the duty of inspection and supervision to see that the work was faithfully and honestly done. The state did not engage in any business or enterprise in any respect comparable to that provided for by the act

under review. It merely exercised governmental and sovereign powers.

The case of *State v. Cooney,* 100 Mont. 391, 47 Pac. (2d) 637, has been cited as authority in support of the act here under consideration. In that case the Montana court had under review an act similar to the one here involved and sustained the act. There, however, the legislature expressly declared that it was creating a *corporation* to be deemed "an agency of the state." It also appears that the Montana Constitution with reference to the creation of corporations by the legislature is different from ours. The Montana Constitution has also been held to have a different meaning from ours in reference to the creation of public indebtedness. We do not consider the case in point here.

The conclusions above stated render it unnecessary for us to consider any of the other objections urged by the Attorney General.

It has been argued that, if any provision of this act is found to be unconstitutional, such unconstitutionality should not affect any of the rest of the act, and in support thereof we are cited to sec. 21 of the act which among other things says:

"If any section or provision or part thereof is for any reason held to be unconstitutional, void or inoperative, it is the intention that the remaining sections and provisions and parts thereof shall remain in full force and effect."

It is indisputable that the legislature possesses the power to create a Board or Department and endow it with authority to discharge governmental duties and so here the legislature possessed the power to create the State Water Conservation Board and arm it with administrative and governmental powers. It did confer on this Board some such powers by way of authorizing surveys and investigations as to water supply, waste and loss, and methods of conservation and other advisory and administrative acts; but such powers as are conferred that may be recognized as governmental and constitutional are mere incidents and preliminary only to the real and essential purposes of the act and the power intended thereby to be granted and the objects meant to be achieved.

Stripped of its corporate, proprietary and unconstitutional powers as pointed out herein, it would be a mere embryo skeleton without vitals or substance and incapable of administration. Where the purpose of the act fails, the incidental powers conferred for the mere purpose of operating the unconstitutional part must also fail. (*Cunningham v. Thompson*, 18 Ida. 149, 155, 108 Pac. 898; *Ferbrache v. Drainage Dist. No. 5*, 23 Ida. 85, 128 Pac. 553, Ann. Cas. 1915C, 43, 44 L. R. A., N. S., 528; *Epperson v. Howell*, 28 Ida. 338, 154 Pac. 621; *State v. Bird*, 29 Ida. 47, 156 Pac. 1140; *Dumas v. Bryan*, 35 Ida. 557, 207 Pac. 720; *State v. Wilmot*, 51 Ida. 233, 4 Pac. (2d) 363.) We conclude that the whole act fails.

The writ is denied.

Givens, C. J., and Morgan, J., concur.

Budge, J., dissents.

HOLDEN, J., Concurring.—More than half the people of the state depend, either directly or indirectly, upon irrigation. The normal flow of our streams has been appropriated and, therefore, the limit of development by irrigation from that source has been reached. Hence, the need of providing additional water by storage, or otherwise, is great, and the purpose of the statute under consideration, most commendable. Notwithstanding the importance and the pressing need of additional water, the statute was loosely drawn without proper regard to, and, apparently, by someone not conversant with, the Constitution of the State of Idaho (it was stated on oral argument that the statute was forwarded from Washington, D. C., to Montana, and from Montana to Idaho). It is most unfortunate that the statute was so drawn. Nevertheless, it is our duty to construe the Constitution as it is written; otherwise, that instrument would soon become useless—a mere scrap of paper. The rule by which this court should be guided in all cases involving the interpretation and construction of the Constitution, is aptly stated by Chief Justice Bronson in *Oakley v. Aspinwall*, 3 N. Y. 547, approved and adopted by this court some 45 years ago in

*People ex rel. Lincoln County v. George,* 3 Ida. 72, 81, 26 Pac. 983. That learned Justice said:

"It is highly probable that inconveniences will result from following the constitution as it is written. But that consideration can have no weight with me. It is not for us, but for those who made the instrument to supply its defects. If the legislature or the courts may take that office upon themselves; or if under color of construction, or upon any other specious ground, they may depart from that which is plainly declared, the people may well despair of ever being able to set a boundary to the powers of the government.

Written constitutions will be worse than useless. Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power—some evil to be avoided, or some good to be attained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary in enlarging the powers of the government opens the door for another, which will be sure to follow; and so the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them. "