(December 17, 1916.)

STATE and ROBERT RAYL, Plaintiffs, v. TWIN FALLS–
SALMON RIVER LAND AND WATER COMPANY,
a Corporation, and SALMON RIVER CANAL CO.,
LTD., Defendants, and A. E. CALDWELL et al., Inter-
venors.

[166 Pac. 220.]

CAREY ACT LANDS—RECLAMATION OF—WATER APPROPRIATION FOR—IN-
SUFFICIENCY OF—SCHOOL LANDS WITHIN CAREY ACT PROJECT—
PURCHASER OF—RIGHT TO WATER FOR—RIGHT OF STATE—STATUTORY
CONSTRUCTION—CONTRACTS—CONSTRUCTION OF—CAREY ACT—CON-
STRUCTION OF—SUFFICIENCY OF WATER SUPPLY FOR CAREY ACT
LANDS—WHEN AND BY WHOM DETERMINED—CONSTRUCTION CON-
TRACT—AMENDMENTS TO—ESTOPPEL—APPLICATION TO STATE.

1.   Under the act of Congress known as the Carey Act and the
amendments thereto (28 U. S. Stats. 372–422), and the statutes
of this state applicable thereto, the state made application to the
Secretary of the Interior for the segregation of about 150,000 acres
of land within what is known as the Twin Falls-Salmon River,
Carey Act project, which application was approved on the 10th day
of April, 1908, and a contract was entered into between the United
States government and the state on that date.  The Twin Falls-
Salmon River Land and Water Company was a corporation organ-
ized for the construction of a reservoir and canal system for the
irrigation of said lands, and the state entered into a contract with
said corporation on April 30, 1908, for the construction of the
proposed irrigation works, whereby said construction company
agreed to construct said works in accordance with certain plans
and specifications; and it is provided, among other things in said
contract, that shares of water rights should be sold to persons
purchasing any portions of any state school lands within said pro-
ject which were susceptible to irrigation and reclamation from
said system, at a price not to exceed thirty dollars per share, pro-
vided that said water rights were purchased within one year after
the purchase of the lands from the state, and not exceeding forty
dollars per share at any time thereafter.  The construction com-
pany proceeded and constructed said works under the supervision
of the state authorities.  During the period of construction it was
ascertained that the available supply of water for said project
was less than one-half what it had theretofore been determined

Points Decided.

by the land Department of the government and the state authorities, and was agreed between the state and the construction company that not more than 80,000 acres of said Carey Act lands should be put on the market for sale and settlement. About 73,000 acres of said land were sold by the state to prospective settlers, about 14,000 acres of which thereafter became forfeited because the purchasers failed to comply with the law, thus leaving about 59,000 acres; and on later investigations of the available water supply for the lands within said project, it was ascertained that there was not sufficient water to reclaim the Carey Act lands which had already been sold. Thereafter on June 11, 1915, the state sold 160 acres of its school lands within said project to the plaintiff Rayl, and thereupon Rayl demanded of the construction company and also of the canal company that they sell to him a water right for said land, which they refused to do. *Held,* under the facts that the peremptory writ of mandate will not issue to compel said corporation to sell to him the water right demanded.

2. The construction company was permitted, under the law, to appropriate the water for said land for the purpose of transferring it to the settlers within said project for their use and benefit in connection with the irrigation system, it being intended that the settlers should ultimately own the entire project; the irrigation works and the water rights. The Construction Company was only a trustee in the appropriation of the water.

3. Under the provisions of sec. 1618, Rev. Codes, the state engineer is required to determine and report whether there is sufficient unappropriated water in the source of supply and whether or not a permit to divert and appropriate water through the proposed works has been approved by him, and whether the capacity of such works is adequate to reclaim the land described.

4. Sec. 1619, Rev. Codes, provides that no request for the segregation of lands on which the state engineer has reported adversely as to the water supply, feasibility of the construction, the cost or capacity of the works, or as to the character of the lands sought to be irrigated, shall be approved by the board.

5. *Held,* that the entire plan is one of complete state supervision and control.

6. In carrying out the provisions of the Carey Act and the statutes of this state applicable thereto, there are three contracts required: One between the government and the state, known as the state contract; one between the state and the construction company, known as the construction company contract; and one between the construction company and the settlers, known as the settlers' contract.

7.  The state acts in said matter as the agent or trustee for the settlers.

8.  The general plan is that the cost of reclamation of such lands shall be assessed as a benefit against the land, to be paid by the settler, and that such benefit is assessed through the medium of the state board of land commissioners.

9.  Under the provision of the Carey Act and the state law applicable thereto, the proper officers, both of the government and state, must determine in advance the sufficiency of the water supply, the character and kind of the system of irrigation that must be constructed, and the price to be charged the settlers for an interest therein. These things must all be done before the execution of the contract between the state and the construction company.

10.  Where certain officers of the government and the state are authorized by law to pass upon matters of the character involved in this case, their decision is conclusive where no question of fraud is raised.

11.  The time to ascertain whether the lands are of a character subject to segregation under the Carey Act and whether there is water available for their reclamation is prior to segregation.

12.  The question of the sufficiency of the water supply for the irrigation of a certain tract of land must of necessity be a matter of approximate estimate.

13.  Under the provisions of sec. 3289, Rev. Codes, any water company or corporation is forbidden to contract or sell more water than it is entitled to, and must not sell more water than it has.

14.  By the terms of the state contract, the Construction Company agreed to sell shares of water stock "to the extent of the water rights to which it is entitled . . . . but in no case shall water rights or shares be dedicated to any land before mentioned or sold beyond the carrying capacity of the canal or in excess of the appropriation thereof."

15.  Held, that the cases of *State v. Twin Falls Canal Co.*, 21 Ida. 410, 121 Pac. 1039, and *State v. Twin Falls Canal Co.*, 27 Ida. 728, 151 Pac. 1013, have no application to cases where the water supply is not adequate or sufficient and are not applicable to the facts of this case.

16.  Under the provisions of sec. 3, art. 15, of the state constitution, the right to divert and appropriate the unappropriated waters of any natural stream to beneficial uses shall never be denied, and priority of appropriation shall give the better right as between those using the water.

17.  The state in dealing with a Carey Act project is not dealing in its governmental capacity, but in its proprietary capacity— in its capacity as a private owner improving his own property.

18. The doctrine of equitable estoppel does not apply to the government when it is dealing or operating in its governmental capacity, but when it is operating in its proprietary capacity substantial considerations underlying the doctrine of equitable estoppel apply to the government as well as to individuals.

19. Under the facts of this case, *held,* that an estoppel arises against the state, as no good reason can be offered why the state in its dealings in this matter should not be affected by considerations of morality and right which ordinarily bind the conscience, since the action of a sovereign state ought to be characterized by a more scrupulous regard to justice and higher morality than belongs to the ordinary transactions of individuals, and it clearly appears from the facts of this case that the state should act with fidelity and integrity toward the settlers.

20. Since the state and Rayl knew that the water supply was insufficient at the time said state land was sold and purchased, an equitable estoppel arises against them, and *held,* under the facts and the law, that the state is not entitled to a priority of right for any of said water for the land sold to Rayl.

[As to estoppel of state to take inconsistent positions, see note in Ann. Cas. 1914A, 229.]

Original application for a Writ of Mandate against the defendants requiring them to issue shares of water stock to the Plaintiff Robert Rayl, such water to be used in the irrigation of state school lands purchased by said Rayl within a Carey Act project. The alternative writ heretofore issued quashed and the peremptory writ denied.

J. H. Peterson, Atty. Genl., Herbert Wing and D. A. Dunning, Assts., T. A. Walters, Atty. Genl., and A. C. Hindman, Asst., for Plaintiffs.

The land owners have here agreed for a proportionate interest, and certainly those who purchased subsequent to the state contract cannot be heard to say that the state land is not entitled to any water. The correct rule to be applied in this case is that the water user is only entitled to a proportionate amount of water and that the grant will not be forfeited if a sufficient quantity of water is furnished to raise a reasonably profitable crop by the best methods of husbandry,

and such crop, if necessity demands, may be limited to crops requiring the minimum amount of water.

"It is the policy of the laws of this state, and it has been so declared from time to time by this court, to require the highest and greatest possible duty from the waters of the state in the interest of agriculture and other useful and beneficial purposes." (*Farmers' Co-operative Ditch Co. v. Riverside Irr. Dist.*, 16 Ida. 525, 535, 102 Pac. 481.)

Under the contracts in these cases, the settlers should be required to comply with the rules therein laid down, and, if necessary, limit their crops to those requiring the minimum amount of water.

"By the terms of the contract between the state and the Land & Water Company, the water appropriated was dedicated to the lands segregated and to the school lands within the segregation." (*State v. Twin Falls Canal Co.*, 21 Ida. 410, 121 Pac. 1039.)

Richards & Haga, for Defendants.

The doctrine of *State v. Twin Falls Canal Co.*, 27 Ida. 728, 151 Pac. 1013, and *State v. Twin Falls Canal Co.*, 21 Ida. 410, 121 Pac. 1039, that the purchaser of water rights acquired only a proportionate interest in the system, and that the contract with the state was merely a construction contract, and that the company was not the seller of specific quantities of water or a guarantor of the water supply, has been approved in the following cases, among others, decided by this court; *Bennett v. Twin Falls North Side Land & W. Co.*, 27 Ida. 643, 150 Pac. 336; *Idaho Irr. Co. v. Lincoln County*, 28 Ida. 98, 152 Pac. 1058; *Idaho Irr. Co. v. Pew*, 26 Ida. 272, 141 Pac. 1099.

The state contract, which the state is now seeking to enforce, was entered into under a mistake as to the amount of water available for the lands to be reclaimed thereunder. The enforcement of the contract as made would work a great hardship upon the settlers for whom the state was acting, as well as upon the company, and it would be unfair for the state to now insist upon the enforcement of the provisions of the con-

tract, which rested originally upon its own erroneous estimate of the water supply. "Subsequent events which the parties cannot reasonably be supposed to have had in mind when the contract was made, and which work a hardship to defendant, have frequently furnished a sufficient reason for refusing specific performance." (36 Cyc. 617, 619; *Willard v. Taylor,* 8 Wall. (75 U. S.) 557, 19 L. ed. 501.)

Longley & Walters, for Intervenors.

The right sought to be enforced by a writ of mandate must be clear and well defined, and if its existence is doubtful, the writ will be denied. (*Clough v. Curtis,* 2 Ida. 523, 22 Pac. 8; *Peck v. Booth,* 42 Conn. 271; *People v. Crotty,* 93 Ill. 180; *State v. Omaha,* 14 Neb. 265, 45 Am. Rep. 108, 15 N. W. 210; *People v. New York Infant Asylum,* 122 N. Y. 190, 25 N. E. 241, 10 L. R. A. 381.)

The issuance of such writ would be contrary to the express terms and conditions of our statute. (Sec. 4977.)

If the Twin Falls Canal Co. case means what the state and the defendants claim, we are forced to the conclusion that the state of Idaho and the Construction Company have agreed that the water available, whatever it may be, shall be sufficient for the irrigation of all of the lands included in the segregation, and that it can make no difference whether the available supply will give the amount of two and three-fourths acrefeet, which amount "has been determined to be sufficient," or whether there is but one-half inch of water for one day in the year.

The contract in question has been construed by the United States court in the case of *Caldwell v. Twin Falls Salmon Land & Water Co.,* 225 Fed. 584.

The right given by the permit is merely a contingent right, which may ripen into a complete appropriation or may be defeated by the failure of the holder to comply with the requirements of the statute. The permit, therefore, is not an appropriation of the public waters of the state. (*Speer v. Stephenson,* 16 Ida. 707, 102 Pac. 365; *Nielson v. Parker,* 19

Ida. 727, 115 Pac. 488; *Youngs v. Regan,* 20 Ida. 275, 118 Pac. 499; *Marshall v. Niagara Springs O. Co.,* 22 Ida. 144, 125 Pac. 208; *Washington State Sugar Co. v. Goodrich,* 27 Ida. 26, 147 Pac. 1073; *Highland Ditch Co. v. Union Reservoir Co.,* 53 Colo. 483, 127 Pac. 1025; *Morris v. Bean,* 146 Fed. 423.)

S. H. Hays, *Amicus Curiae.*

A Carey Act company is not engaged in the sale or rental of water. The contract which the company makes with the state relates to construction matters only. (Secs. 1621, 1622, Rev. Codes; *Sauve v. Title Guaranty & Surety Co.,* 29 Ida. 146, 158 Pac. 112.)

From the beginning it was understood that the companies building the works stood in the position of construction companies only. (Mead's Irrigation Institutions, p. 272; *State v. Twin Falls Canal Co.,* 21 Ida. 410, 424, 121 Pac. 1039.)

The water under the statute and the contract in this case is appurtenant to the land and dedicated to it, and in this case has not been detached from it. (*Paddock v. Clark,* 22 Ida. 498, 126 Pac. 1053.)

This rule of proportionate interest has been settled in this court. (*State v. Twin Falls Canal Co., supra.*)

The local land officers are given no power under the Carey Act to pass upon the plans. These plans are at once submitted to the officer who is the final arbiter of the department. His action is final. He cannot give an approval with a reservation, mental or otherwise, to the effect that he will not patent the lands unless the water supply should thereafter turn out to be as abundant as it had been in the past, or as satisfactory as he supposed it to be. The plans are presented to him for action and his action is final upon everything except the matter of the construction of the works, that being the only matter that, as stated, can be affected by human agency. (*Burke v. Southern Pacific R. Co.,* 234 U. S. 669, 34 Sup. Ct. 907, 58 L. ed. 1527 (1552); *Cowell v. Lammers,* 21 Fed. 200; *Davis v. Weibold,* 139 U. S. 507, 11 Sup. Ct. 628, 35 L. ed. 238; *Barden v. Northern Pacific R. Co.,* 154 U. S. 288, 14 Sup.

Ct. 1030, 38 L. ed. 922; *Shaw v. Kellogg,* 170 U. S. 312, 18 Sup. Ct. 632, 42 L. ed. 1050.)

If a matter in which the government is involved is given over to an officer for his determination, his decision is final. (Wyman's Administrative Law, sec. 116, p. 333; *United States v. California & Oregon Land Co.,* 149 U. S. 31, 13 Sup. Ct. 458, 37 L. ed. 354.)

W. G. Bissell, *Amicus Curiae.*

Water is, in our state, a commodity, its appropriation for the purpose of rental and sale being expressly recognized by the constitution; and when once appropriated is subject to disposal by contract and to barter and sale as other real estate (*Hall v. Blackman,* 8 Ida. 272, 68 Pac. 19; *McGinness v. Stanfield,* 6 Ida. 372, 55 Pac. 1020; *Village of Hailey v. Riley,* 14 Ida. 481, 95 Pac. 686, 17 L. R. A., N. S., 86; *Gard v. Thompson,* 21 Ida. 485, 123 Pac. 497), and is something that has a recognized legal measurement (sec. 3241, Rev. Codes), whereby it may be measured and described when sold and rented.

The contract here expressly provides that the extent of the water right sold is two and three-fourths acre-feet of water, and is a legal and binding contract.

Sec. 3289, Rev. Codes, provides: That any company owning or controlling any irrigation works for the distribution of water under the sale or rental thereof shall furnish water to all persons, owning or controlling land susceptible to irrigation therefrom. But *such company* is positively forbidden to contract to deliver more water than it owns.

In this case the plaintiff, under the admitted facts, is asking this court to compel the defendant company to contract to deliver more water than it has title to, and is here asking the aid of a court of equity to compel the company *to do an act expressly forbidden by law. The court cannot order the defendant to violate the statute.*

SULLIVAN, C. J.—This is an original application to this court for a writ of mandate against the defendants, requiring

them to issue shares of water stock to the plaintiff Robert Rayl, the water to be used in the irrigation of state school lands purchased by said Rayl within a certain Carey Act project commonly called the Twin Falls-Salmon River project.

The defendant Twin Falls-Salmon River Land & Water Company is a Carey Act construction company, organized for the purpose of constructing, operating for a time and disposing of to the purchasers of land within such project the reservoir and canal system and the water rights connected therewith of said Carey Act project. Said company will hereafter be referred to as the Construction Company.

The defendant Salmon River Canal Company is a corporation organized for the purpose of taking title to said system and water rights after the completion of the system, and holding, operating and maintaining the same, and distributing among its stockholders and others, equally and ratably, the water for the irrigation of the lands within said project, and to do all things necessary for the purpose of keeping said canal system in proper repair. The express purpose of said canal company was to receive title from the Construction Company to the canals, dams and franchises of said company, holding and operating the same for the land owners in said project, which company will be hereafter referred to as the Canal Company.

The application for the segregation of the lands within said Carey Act project was made to the state board of land commissioners on August 12, 1907. Prior to that time an application for a permit to appropriate the waters of Salmon river for the land covered by the application was filed with the state engineer, and at the time of filing said proposal the water right permit was also filed, as required by sec. 1615, Rev. Codes.

This application was made by four citizens of the state of Idaho, and contains, among others, the following statements or proposals:

"The undersigned . . . . respectfully represent to your Honorable Board that they have been for some time engaged in surveying, estimating and making plans for the construc-

tion of extensive irrigation works in the County of Twin
Falls, in this state, for the purpose of irrigating a large tract
of arid land lying to the southerly of the South Side Twin
Falls Carey entry. That they desire to, and with the ap-
proval of your Honorable Board will, construct irrigation
works which will cover and irrigate and render fit for farm-
ing and the growing of crops adapted to the climate of that
locality upon said tract of arid land, covering and includ-
ing an area of approximately one hundred fifty thousand
acres. . . . .

"Your petitioners further represent that if this applica-
tion meets with the approval of your Honorable Board, that
they will cause to be organized a corporation with capital suffi-
cient to complete said works and put the same in operation·
upon said entire tract within the period of five years from
the date of the segregation of the said lands by the United
States government.

"Your petitioners, and said corporation so to be formed,
propose to construct the irrigation works necessary to prop-
erly irrigate for the growing of ordinary farm crops the lands
shown on Exhibit 'A,' and scheduled in Exhibit 'B,' and also
such State school lands, Sections Sixteen (16) and thirty-six
(36), as lie within said tract.

"The source of the water supply for such irrigation works
and plant is a large area of mountainous country forming the
water supply to the Salmon River, which rises near the bor-
ders of the states of Idaho and Nevada, together with the flow
of water in said stream. Reservoirs are to be constructed,
which will impound, hold and conserve all of the waters of
said watershed and drainage area, which by natural flow will
find their way to the bed of said stream, this impounding pro-
cess to be continued throughout the year. . . . .

"Your petitioners propose to sell perpetual water rights,
pursuant to the laws of this state and the said so-called Carey
Act, for the sum of Forty Dollars ($40.00) per acre water
right. . . . . "

To this application was attached a description of the land
sought to be segregated, and also plans and specifications for

the construction of reservoirs and a canal system for the irrigation of said lands. The state engineer, as required by sec. 1618, Rev. Codes, having reported that there was sufficient unappropriated water in the source of supply to satisfy said project, said application was approved by the state land board and thereafter a proper application was made to the Secretary of the Interior for the approval of said application, and was approved on April 10, 1908, and a contract was entered into between the government and the state on that date.

The Construction Company was organized as a corporation under the laws of this state, and on April 30, 1908, entered into a contract with the state for the construction of the proposed irrigation works, it having taken over all of the interests of the applicants for said segregation. Said construction contract contains, among other things, the following provisions:

Paragraph 1. "The party of the second part agrees . . . . to sell shares or water rights in said canal and irrigation system . . . . to the person or persons filing upon the lands hereinafter described and also to the owners of other lands, not described herein, but which are susceptible of irrigation from this canal system. . . . . "

Paragraph 6. " . . . . It will sell or contract to sell water rights or shares for land to be filed upon to qualified entrymen or purchasers without preference or partiality other than that based upon priority of application, . . . . the water rights having been taken for the benefit of the entire tract of land to be irrigated from the system. . . . . "

Paragraph 8 provides that the shares or water rights are to be sold to persons filing upon Carey Act lands at a price not exceeding forty dollars per share; also, "To the person or persons purchasing any portion of sections No. 16 or 36, which are susceptible of irrigation and reclamation from this canal, at a price not to exceed Thirty Dollars ($30.00) per share, provided said water rights are purchased within one year after the purchase of the lands from the State and not exceeding Forty Dollars ($40.00) per share at any time thereafter."

It is under the latter clause of this provision that the state claims a preference right to water for state school lands. Regardless of the fact that the Construction Company had agreed with the state to sell water rights to all purchasers of Carey Act lands, as well as school lands, without preference or partiality, the state now asks a preference.

It appears from the conceded facts that there is not sufficient water to reclaim all of the land within said project for which water had been sold prior to the date that plaintiff Rayl purchased his said land from the state. In short, the contention of the state is that it has a preference right for water sufficient to reclaim all of the state school land within said project, amounting to 6,200 acres.

The defense is largely based on the contention that the court should not by writ of mandate compel the Construction Company to furnish water to said state school lands, since to do that would so deplete or decrease the proportionate share of water which could be delivered to Carey Act entrymen that they would not have sufficient water to reclaim their lands, and for that reason they would not be able to obtain a patent to said land from the government, and that their right to a patent would thus be forfeited, as it is contended that patent will not issue from the government unless it appears that an ample supply of water has been furnished in a substantial ditch to reclaim such lands.

This case involves the application of the law to the rights of settlers as between themselves on Carey Act projects, and also the construction to be placed upon the Carey Act as well as the laws of the state applicable thereto, and the contract between the Construction Company and the state.

It was intended by the Carey Act to provide a certain definite plan for the segregation and reclamation of the desert lands, and under the law the machinery for carrying out this plan is provided. The proper construction and application of the law to the facts of this case appears more difficult than in any case that has been presented to this court.

The agreement between the state and the Construction Company at first involved the irrigation of 150,000 acres of land.

Later on, it appearing that there was not sufficient water to irrigate that number of acres, there was an understanding between the state and the Construction Company that the works should be constructed to cover only 100,000 acres, with leave to enlarge the project if found desirable. Still later on, in order to safeguard the project, an arrangement was made between the parties to said contract whereby only 80,000 acres of the Carey Act land were to be thrown open to settlers; and very soon thereafter 73,348 acres of such land were entered, and shortly thereafter it was understood between the company and the state that no further Carey Act entries should be permitted. These arrangements were amendments to the original contract, and reduced the area of the project to less than one-half of its original acreage.

The Carey Act contracts provide that amendments may be made to them from time to time by agreement between the parties. This was done in order that subsequent conditions which may arise might be properly dealt with, and in order that the intending settler might have notice that such a power was reserved to the state and the Construction Company, subject, of course, to the vested rights of the settlers.

All of the above-stated facts do not appear from the record, but do appear from the public records of the state.

On still later investigation and measurements of the water supply for said project, it appeared that there would not be sufficient water to reclaim more than from fifty to sixty thousand acres. However, it is contended by the plaintiff and counsel who appears as a friend of the court that this makes no difference whatever, since under the proper construction of the Carey Act and the law of this state applicable to Carey Act projects, the plaintiff has a right under the contracts between the state and the government and the state and the Construction Company and the Construction Company and the settler to a water right for the land purchased by him of the state, and this contention is based, first, on the proposition that when this project was initiated and a water permit was taken out by the Construction Company for 1500 second-feet of water, it was dedicated to the irrigation of the land in-

cluded in said segregation; that by subsequent arrangement this area of land was reduced from 150,000 acres to 73,348 acres of Carey Act and desert lands, plus such school lands as might be in the project, and that a very considerable acreage of said lands so entered had been forfeited under the provisions of sec. 1628, Rev. Codes, so that the project had been reduced in area to about 57,000 acres of entered land; that the water supply thereafter became dedicated to said number of acres of land which were already entered at the time said arrangement was made and to the school lands within said project; and, second, that under the contract and statute, persons obtained water rights for a proportionate interest in the water supply dedicated to said entire tract; that settlers have equal rights in that supply and there is no priority among them; that they share equally in the advantages and disadvantages of the water supply; that a proportionate part of the water supply having in the beginning been contracted for and been set apart to the land in question, such water supply cannot be taken away from it, even though other settlers claim the total supply to be insufficient, since other settlers have no priority; that for those reasons the plaintiff is entitled, under sec. 1615, Rev. Codes, to his proportionate part of the supply, whatever it may be; that such water was set apart to this state land in the beginning and has never been taken away. This latter contention is based upon the state contract with the Construction Company.

On June 1, 1908, about 80,000 acres of said land were thrown open for settlement, and, as before stated, 73,348, were entered. The irrigation works were constructed and notice given that water would be ready for delivery on April 12, 1911. Subsequently about 14,000 acres or more of the lands entered were not settled upon and the rights of the entrymen became forfeited under the provisions of sec. 1628, Rev. Codes. This reduced the area of the project to approximately 57,000 acres. About 30,000 acres of said land was put in cultivation prior to the purchase of said state land by Robert Rayl on June 11, 1915.

It appeared from the original report of the state engineer that in his opinion there was upward of 400,000 acre-feet of water available for the irrigation of the 150,000 acres of land included in the first segregation. It now appears by measurement made in later years that the average annual flow of said river for the past five years is approximately only 130,000 acre-feet. This difference may be accounted for in several different ways. The state engineer may have made a mistake in his estimates, or in latter years there may have been actually less natural flow than formerly, caused by less natural precipitation in that basin, thus lessening the flow of said river. The state engineer may have gotten his information of the annual flow of said stream from settlers in that region and they may have over-estimated the annual flow thereof. It was represented to the land board by one of the old settlers in that vicinity, as shown by the board's record, that the amount of water in the stream was sufficient to irrigate 150,000 acres of land. The result was arrived at by stating that the stream had a certain width and a certain depth and the flow of the current was at a certain rate, and that this volume of water lasted for a certain period. Examinations of the stream during later years seem to disclose the fact that said river has the width and depth and rate of current mentioned by this old settler, but during late years this flow has not continued for the length of time each season stated by him. That may have been caused by a higher temperature, thus causing the more rapid melting of the snows. This might illustrate the manner in which an error could have been made by the state engineer when he stated that over 400,000 acre-feet of water could be impounded annually for the irrigation of said 150,000 acres of land.

In Vol. 1 of Report of Special Committee, U. S. Senate, on irrigation and reclamation of arid lands, Rep. No. 928, May 8, 1890, p. 40, it is estimated that said Salmon River has a flow of 1820 cubic-feet per second of time, when, as appears from the record, it has an annual flow of less than one-third of that amount of water.

The holding capacity of the reservoir at one time was supposed to be about 180,000 acre-feet, which, in addition to the natural flow of the stream, was expected to supply a total amount of water in the reservoir of two and three-fourths acre-feet per acre for the land to be irrigated. This idea is gathered from paragraph 4 of the state contract.

It appears from the record that the available water supply is insufficient to properly irrigate more than 50,000 or 60,000 acres of land within said project. However, this matter has not been fully determined; there may not be even sufficient water to properly reclaim that number of acres, and the question is presented whether, under the facts of this case and the law applicable thereto, the plaintiff is entitled to water for the irrigation of his lands and may compel by mandate the defendants to sell him a water right.

A letter dated November 1, 1915, from the Commissioner of the General Land Office is attached to the answer of the Construction Company, in which the commissioner states, among other things:

"I have carefully considered the last report upon this project made by a Carey Act Inspector of this office, some three years ago, various reports on the project by the Geological Survey, the reports of the State Engineer of the State of Idaho, the project engineer, numerous reports of experts, such as Don Bark, on nearby projects similarly situated, and from the mass of data thus considered, have come to the conclusion that I would not be justified in recommending to the Department the approval of over 45,000 gross irrigable acres, including all classes of land under the project, or about 40,000 net irrigable acres.

"It should be understood that when the State presents its list for patent for the lands in this segregation, another full and complete investigation will be made by a Carey Act inspector of this office, and that upon his report, data may be forthcoming which will change this estimate. From present indications however, 40,000 net irrigable acres appears to be the maximum, and such report might show the necessity of a further reduction in area."

It is contended by S. H. Hays, Esq., who appears as a friend of the court, that since the Land Department of the government had approved the water supply before the land was segregated in said project, that question is no longer open, so far as the government is concerned; that under the Carey Act it was made the duty of the Secretary of the Interior to determine the sufficiency of the water supply before any segregation was made, and that question was determined by him before the project was approved and the land segregated; that after the approval of the project there remained nothing further, so far as the government is concerned, under the law, than the construction of the irrigation works in accordance with the plans and specifications; that all other matters were passed upon in advance of the segregation; that the ample supply of water mentioned in the Carey Act of 1896 refers to the supply which had been predetermined to be sufficient.

The language of the act is that "a patent shall issue when an ample supply of water is actually in a substantial ditch or canal." The water supply might be directly affected by the failure to build the works as provided by the contract; that is, if the works were not constructed with a sufficient capacity to irrigate the land, or if they had not diverted or carried the amount of water proposed in the plans, there would be a failure to provide an "ample supply of water," within the meaning of the act of 1896, and counsel contends that it is to such cases that the act refers and not to cases where nature has failed to furnish the proper quantity of water after the works were constructed.

Counsel also contends that the whole question as to the right of a patent from the government to said lands turns upon the question as to whether the Secretary of the Interior decided that there was a sufficient water supply at the time of the approval of the plan for the construction of the works, and whether having once decided the question of the water supply, he may after the completion of the works reconsider and reverse his former decision.

It is claimed that under the law the state engineer for the state and the Secretary of the Interior for the United States

government were called upon to determine the sufficiency of the water supply, and that that has been done and the construction of the system was really based on the decision of that question and the adoption of the plans for the construction of the irrigation system.    The water supply having been determined to be sufficient, the Construction Company was then willing to go on under the law and complete the system and recover the cost of such construction by selling the water rights and system to owners of the land within said project. The question is fairly presented whether under those facts the government can in good faith now refuse to patent the land to the state and thus defeat the Construction Company in collecting the cost of the system and the settlers from procuring a title to their lands.

The Construction Company was permitted, under the law, to appropriate the water, but only for the purpose of transferring it to the settlers for their use and benefit in connection with the irrigation system constructed by it.

In order to determine the questions involved in this case, it is necessary to consider the plan of reclamation contemplated by the Carey Act and the procedure thereunder, and the character of the grant made by the United States to the state.

Prior to the time of the enactment of said law, there was a demand from the states in which was located a great deal of arid land that the general government grant to each state in the arid region all of the arid irrigable lands within such states.    It was in response to these demands that the acts of Congress known as the Carey Acts were enacted (sec. 4 of the act of Aug. 18, 1894, 28 Stats. at Large, 372; Act of June 11, 1896, 29 Stats. at Large, 413; sec. 3 of the act of March 3, 1901, 31 Stats. at Large, 1133), granting to each of the states in the arid region one million acres of land, provided the states would secure the reclamation of such tracts, and authorizing the states to fix a lien upon the land "for the actual cost and necessary expense of reclamation and reasonable interest thereon."    In other words, to assess the benefits against

the land which would accrue by reason of the making of the proposed improvements.

This state, in pursuance of the Carey Act, provided by statute (sec. 1615, Rev. Codes) that proposals and requests might be made to the state board of land commissioners for the building of such works for the irrigation of definite tracts of land to be described in the proposal, the work to be done under the supervision of the state and to the satisfaction of the state engineer. (Sec. 1623, Rev. Codes.) A construction company desiring to build such works may make a proposal to do so for the irrigation of certain definite tracts of land, according to certain definite plans. (Sec. 1615, Rev. Codes.) This proposal really amounts to a bid for the doing of the work or the construction of the irrigation system. Sec. 1617, Rev. Codes, provides that at the time of making such proposal, the construction company "shall have filed with the state engineer an application for a permit to appropriate water for the reclamation of the lands described" in the proposal. This seems to have been deemed a convenient way of attaching the water supply to such project.

By the provisions of sec. 1618, Rev. Codes, the state engineer is required to determine and report "whether there is sufficient unappropriated water in the source of supply, and whether or not a permit to divert and appropriate water through the proposed works has been approved by him; whether the capacity of the works is adequate to reclaim the land described"; and other requirements. This determination of the state engineer seems to have been intended to be final, since it is provided in sec. 1619, Rev. Codes, that "No request on which the State Engineer has reported adversely, either as to the water supply, the feasibility of the construction, the cost or capacity of the works, or as to the character of the lands sought to be irrigated, shall be approved by the board."

The entire plan seems to be one of complete state supervision and control.

The interest which the settler has in the enterprise is defined by said sec. 1615, Rev. Codes, it being thereby required

that the proposal shall state "the price and terms per acre at which perpetual water rights will be sold to settlers on the land to be reclaimed, said perpetual rights to embrace a proportionate interest in the canal or other irrigation works, together with all the rights and franchises [water rights] attached thereto." This "proportionate interest" was intended to be in the right represented by the water permit taken out for the projects. It was intended that the settlers should ultimately own the entire project—the works and the water rights.

After the approval by the state engineer and by the land board, the plans must be presented, under the state and national laws, to the Department of the Interior for approval. (See sec. 1619, Rev. Codes.) Under the rules and regulations provided by the Land Department of the government, among other things the state is required to furnish "all information necessary to enable this office [the office of the Commissioner of the General Land Office of the United States] to judge of its practicability for irrigating all of the lands selected." (See regulations concerning the selection of desert lands under the Carey Act, 20 L. Dec. 441.) This information was required in order that the United States Land Department might investigate and intelligently pass upon the practicability of the plan and capacity of the works proposed and the sufficiency of the proposed water supply for properly irrigating the lands selected.

After approval by the Department of the Interior, the government may enter into a contract with the state for the patenting of the lands to the state or its assigns. (Sec. 4 of the Carey Act.) The state enters into a formal contract with the construction company to construct the works in accordance with the plans approved by it. (Sec. 1621, Rev. Codes.) Entries of these lands are made before the state land board. Persons entering such lands must present to the state a contract with the constructing company, showing that they have agreed to pay the amount of the lien fixed by the state against the land for the water right and works and that they are entitled to a proportionate interest in the irrigation works and

appurtenant water supply upon full payment therefor. The form of contract to be entered into between the settler and the construction company must be approved by the state land board.

There are thus three contracts: One between the government and the state, known as the state contract; one between the state and the construction company, known as the construction company contract; and one between the construction company and the settler, known as the settlers' contract. After these three contracts are entered into, the lands, or a portion thereof, may be thrown open for settlement. (Sec. 1625, Rev. Codes.) The state acts in the matter of making the contract and in the approval of a form of settlers' contract, as well as in other matters, as the agent or trustee for the settlers who are in the future to inhabit the land within the project.

Thus it will be seen that before making any contract, the plan for the irrigation works or system must be approved by both the state and national authorities and the sufficiency of the water supply determined by each. Clearly, the general plan is one providing that the cost of the reclamation of such lands shall be assessed as a benefit against the land to be paid by the settler, and that the benefit is assessed through the medium of the state board of land commissioners.

Of course, the engineers of the Construction Company examined the sources of water supply and no doubt satisfied themselves that there would be sufficient water to reclaim the land asked to be segregated; but the determination of the question of the water supply was up to the state and the Secretary of the Interior. In the first instance, if upon such an application the Secretary of the Interior concludes that the water supply is not sufficient, he refuses the application for segregation; and if the state concludes that the water supply is not sufficient, the application is denied. But after the state has decided that question in favor of an ample supply of water, and the Secretary of the Interior has also decided that an ample supply of water exists, that question is settled, so far as the government and the state are concerned.

That question was evidently understood to have been fully settled by proper authority before the Construction Company would undertake the expenditure of from two to three millions of dollars in constructing an irrigation system. Is it possible that any good business man or corporation would consent to the expenditure of two or three million dollars in the construction of an irrigation system, leaving the question open for the state and government to decide thereafter whether there was a sufficient water supply for the project? It seems to us not.

The only method of remuneration to the Construction Company was a lien on the land and water rights, and, of course, if the Secretary of the Interior should decide before the Construction Company began the construction of the system that there was an ample supply of water, and then when the system was completed decide that there was *not* an ample water supply and refuse to have patents issued for the lands contained in the project, it would certainly be treating the Construction Company in a manner that would not be permitted between private citizens. In fairness to the Construction Company, the government ought not to be permitted at this late day, after the Construction Company has completed its contract so far as the construction of the works is concerned, to refuse to patent to the state or its assigns all land within said project that has been sold by the state upon which settlers have complied with the law in relation thereto.

There no doubt has been a mistake made, both by the state authorities and by the Secretary of the Interior, in estimating the amount of water available for the reclamation of said project, and the Construction Company ought not, in justice or equity, to be required to bear the full burden of such mistake. Neither should the settler be required to bear any greater burden than equity and justice would require, under all of the facts of this case.

If a compromise can be made in this matter so that the number of acres in the project may be scaled down to correspond to the quantity of water actually available, it would be better for all concerned; and the state ought not to insist on

selling what remains of state school lands in said project to the detriment of settlers to whom it has already sold land, either state school land or land under the Carey Act.

It is clear, under the provisions of the Carey Act and the state law applicable thereto, that the proper officers there referred to must determine in advance the sufficiency of the water supply, the character and kind of system of irrigation that must be constructed and the price to be charged the settlers for an interest therein. This matter is not left to the judgment of the Construction Company. The whole matter must be first approved by the state and then by the federal government. These things are all done before the execution of the contract between the state and the Construction Company. A lien upon the land is provided for to reimburse the Construction Company, and it is not until all these things are done that the land is thrown open for settlement. However, the land may be thrown open for settlement before the works are completed. We think the law is well settled that where officers, such as the state engineer, the state land board and the Secretary of the Interior, are authorized by law to pass upon matters of this character, their decision is conclusive. (*United States v. California & Oregon Land Co.,* 148 U. S. 31, 13 Sup. Ct. 458, 37 L. ed. 354.)

The Secretary of the Interior has the duty imposed on him of examining the water supply and plans for the construction of the works, and approving or rejecting them. If he approves, his action is final at that time, so far as the water supply is concerned.

In the Annual Report of the Commissioner of the General Land Office for 1911, pp. 11 and 12, in speaking of the Carey Act projects, it is said:

"The importance of this [the examination of Carey Act projects] cannot be overestimated, for not only will the lands remain segregated for a long period of time if the order therefor is once made, but in making such segregation the Department is practically committed to the feasibility of the proposition submitted by the State, and the people thereafter dealing with the State are in a great degree entitled to regard the

proposition of the state as having received the endorsement of the Department.''

The Secretary of the Interior in 37 L. Dec. 489, in speaking of Carey Act projects, said: ''In brief, the time to ascertain whether the lands are of the character subject to segregation under the Carey Act, and whether there is water available for their reclamation, is prior to segregation.''

Under the law the question of the sufficiency of the water supply must be decided by the Secretary of the Interior when the application for segregation and plan are presented to him. That is the purpose and object of their presentation, and if the plan is not feasible and the water supply not sufficient, it is the duty of the Secretary to reject it; but if he finds it feasible, it is his duty to approve it, and he did approve the plan in this case. When the Secretary gave his approval, he gave it with the knowledge that the lands were then and there segregated from the public domain, and upon his approval a lien would be fixed by the state, under the statute, on the land for the cost of the construction of the system, which lien must be paid by the settler; that large sums of money must be expended in the construction of irrigation works for the reclamation of the land upon the faith of the lien so established. Those matters which after the presentation of the plan can be affected by human agencies, such as the construction of the works, are for subsequent determination; the others are not. The company building the works is a construction company only. It constructs the works and payment to it must be made from the lien fixed by law upon the land. The Secretary of the Interior in effect said to the construction company and the state, ''If you build these works, as per the plan as approved, the grant of land is earned.''

No doubt the state authorities had sufficient evidence before them on which to hold that the supply of water would be amply sufficient to reclaim the land in said project, and the same may be said of the Land Department of the United States. However, it is well known that the water supply of streams in the arid region fluctuates considerably from year to year, so that the question of the sufficiency of the water

supply for the irrigation of a tract of land must always be a matter of approximate estimate.

There is also another factor affecting irrigation projects, and that is the same volume of water will suffice to irrigate much more land after the land has been cultivated a few years than it will in the earlier stages of the irrigation thereof. Taking the fluctuations of the water supply in the streams year after year in arid regions, the variableness of the seasons and the fact that the same supply is much more efficient in an older project than it is in a new one, it will at once be observed that the question of water supply for a certain tract of land is a question of estimate. If the proof presented to the Secretary of the Interior had not been sufficient, he would not have approved the project, since in this case no question of fraud arises. When this plan was approved, the question of the water supply was determined. The natural water supply is a thing that cannot be changed by human effort, and the only thing to be done after the approval of the plan by the Secretary of the Interior was to build the works in accordance with the plan. If that is done by the company, it has performed its duty, provided it has done nothing adversely affecting the water supply originally provided for the project.

As before stated, the Construction Company was not the owner of the water. Under the law it was permitted to make an appropriation of the water for a specific purpose, and before such appropriation was completed, it must construct works amply sufficient to carry such water for irrigation to the place of intended use, as provided by the contract with the state.

Under the general laws, sec. 3289, Rev. Codes, any water company or corporation is forbidden to contract or sell more water than it is entitled to, and the general law clearly contemplates that such a corporation must not sell more water than it has. The contract of the state with the Construction Company authorized the sale of water only to the extent of the water right acquired for the reclamation of the lands in the project, and forbids the issuance of water contracts in excess

of the appropriation for water. The appropriation permit issued by the state engineer to the Construction Company permitting it to appropriate 1,500 cubic-feet of water per second of time was simply a permit to appropriate that amount of water provided there was that amount in the source of supply. It would be impossible for the Construction Company to appropriate 1,500 cubic-feet of water in a certain locality where there were not to exceed 500 cubic-feet that would be supplied from that source.

The permit is simply a legal document, rather than the actual appropriation of water, since a permit cannot place 1,500 cubic feet of water per second of time where nature has placed only about one-third of that amount.

It is clearly manifest from said contract that notwithstanding the estimated water supply, the state realizing the possibility of error in weather forecasts, expressly provided that water contracts should not be sold in excess of the water rights belonging to the company. By the terms of the state contract the company agreed to sell shares of water rights "to the extent of the water rights to which it is entitled . . . . but in no case shall water rights or shares be dedicated to any lands before mentioned or sold beyond the carrying capacity of the canal or in excess of the appropriation thereof."

This language ought not to be construed to mean that the company might sell water rights for far more land than its water supply could reclaim. To do so would be to ignore both the spirit and the letter of the contract between the state and the company.

It has been suggested by the attorney general that the decisions in the case of *State v. Twin Falls Canal Co.*, 21 Ida. 410, 121 Pac. 1039, and *State v. Twin Falls Canal Co.*, 27 Ida. 728, 151 Pac. 1013, have established the right of every acre of land in a Carey Act project to a proportionate interest in the water supply, no matter how inadequate the supply may be. Neither of said cases support that contention. In both of those cases the court held that the water supply was insufficient and in the West case stated as follows: "There is noth-

ing in the record to show that said amount of water is not amply sufficient to properly irrigate all of the land if used in turn,'' etc.   The full amount of water appropriated for the project involved in the West and Weaver cases, to wit, 3,000 second-feet, was available at the head of the canal, whereas in the instant case, no more than one-third of the 1,500 second-feet attempted to be appropriated is available for the irrigation of the land within the project under consideration.   Those decisions establish the law applicable to those cases where the water supply is shown to be adequate, but they have no application to cases where the water supply is not adequate or sufficient.   The West and Weaver cases do not hold that where the water supply is inadequate, it must be divided up so as to make it impossible to reclaim the land in the project.   Those decisions have no application to the case at bar.   It was not the intention of the framers of the constitution nor of the several irrigation acts of the legislature to have the public waters of the state so distributed as not to properly irrigate the agricultural lands for which they may be appropriated, and thus make a failure of the proper reclamation of our arid lands.

It is declared by sec. 3, art. 15, of the state constitution that ''The right to divert and appropriate the unappropriated waters of any natural stream to beneficial uses shall not be denied.   Priority of appropriation shall give the better right as between those using the water.''   The state authorities cannot set aside those provisions of the constitution by holding that the state may reserve water for all state lands for an indefinite time or until all state lands may be sold, since at the present rate of sale under the law, it would take at least 150 years to sell all of the state lands.   The constitution and the law clearly contemplate that as between agricultural appropriators of water, the first in time shall be the first in right. But it may be said that the water appropriated for the project under consideration was intended for the entire project. That is very true in case there had been sufficient water supply available for the reasonable reclamation of all of the land within such project.   However, the state ought not to be per-

mitted, under the law and the facts of this case, to take water from those settlers on said project who had purchased their water right and applied it to a beneficial use prior to the sale of the land to Rayl.

As I view it, it is most unfair, unjust and inequitable for the state to insist on such a construction of said contract as would deprive the purchaser of Carey Act land of sufficient water to reclaim his land, provided he had purchased his water right and land prior to the sale of the school land. That certainly would be the result if the water supply is only sufficient to reclaim one-third of the land in said project, and if the settler must pay forty dollars for an acre water right and then only get one-third of an acre right, that would make it cost him $120 per acre water right, instead of forty dollars as per his contract.

The theory of "proportionate share" of the water appropriated ought not to be adopted in this case, as it would certainly result in the financial ruin of many of the settlers, since it would be impossible for them to pay for their water right at the rate of forty dollars an acre and support their families and get only water sufficient to reclaim a third of their land.

It is not true that the contract for the state for water to reclaim the school lands is of any higher order than the contract of the settler with the construction company for water to reclaim the Carey Act land which he purchased from the state. The state is the party which made the first mistake in regard to the amount of water available for said land, and the settler clearly understood that the state was promoting said project. The state as well as Rayl well knew when Rayl purchased said school land that the water supply for said land had long prior to his purchase been exhausted.

The state in dealing with a Carey Act project is in substance making a contract for the improvement of land which the government has contracted to grant to it. It is not dealing in its governmental capacity, but in its capacity as private owner improving his own property—in a proprietary capacity.

Generally the doctrine of equitable estoppel does not apply

to the government.   (16 Cyc. 780.)   There are, however, exceptions to this rule.   (See *United States v. Stinson*, 125 Fed. 907, 60 C. C. A. 615; *United States v. Willamette Valley etc. Road Co.*, 54 Fed. 807.)

In the Stinson case the court said: "When the government seeks its rights at the hands of a court, equity requires that the rights of others as well, should be protected. (*Carr v. United States*, 98 U. S. 432, 438, 25 L. ed. 209, 211.) The government may not in conscience ask a court of equity to set on foot an inquiry that, under the circumstances of the case, would be an unfair or inequitable inquiry. The substantial considerations underlying the doctrine of estoppel apply to government as well as to individuals."

It is very true that the government should not be affected by the laches of its agent, and this doctrine is covered by the general rule. In a case such as the one under consideration, however, the state may properly be estopped from taking conflicting positions at different times without just reason.

2 Pomeroy on Equity Jurisprudence, sec. 804, states: "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract or of remedy, as against another person who has in good faith relied upon such conduct and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, of contract, or of remedy."

The state here is claiming the right to compel the Construction Company to give Robert Rayl a water right contract for certain school lands. The record shows that, with the consent of the state, settlers had purchased from the state between 50,000 and 70,000 acres of land in said project, some 30,000 acres of which were put in cultivation through irrigation by water rights purchased from the Construction Company by and with the consent of the state prior to the time that the plaintiff Rayl made his purchase of the school land here involved, which purchase was of the date June 11, 1915.

Then the question arises whether under the circumstances and facts of this case an estoppel arises against the state. It is conceded that there is not water sufficient to properly irrigate more than 50,000 or 60,000 acres of the land within said project, and the question also arises whether in good morals and common honesty the state may require the settlers who purchased water for the irrigation of their lands long prior to the time that the school land was sold to the defendant Rayl, with the state's consent and approval, to give up without compensation a part of such water for the irrigation of the lands sold by the state to Rayl.

It seems to me quite clear that under the facts the state ought not to be permitted to succeed in this case, provided there is not sufficient water to irrigate all of the lands that were held in said project under valid contracts made prior to the sale of the land by the state to Rayl. No good reason can be offered why the state in its dealings with this matter should be unaffected by considerations of morality and right, which ordinarily bind the conscience, and the observance of honesty and fair dealing on the part of the state may become of higher importance than reserving water for the irrigation of school lands, which water the state had consented to sell to the settler upon land which the state itself had sold to him. As was said in *Woodruff v. Trapnall*, 10 How. (51 U. S.) 190, 13 L. ed. 383, we naturally look to the action of a sovereign state to be characterized by a more scrupulous regard to justice and higher morality than belong to the ordinary transactions of individuals.

We are clearly of the opinion that under the facts of this case the state and Rayl are estopped from procuring or claiming the right sought in this proceeding.

It is the contention of the state that water from said project must be supplied to the state school lands at all hazards, and that even if the settlers on said project had purchased prior to the time of the sale to Rayl all of the water which said system could furnish, and all of which water was necessary for the irrigation of their lands, the settlers must give up sufficient water to reclaim and properly irrigate all of the

school lands within said project, thus losing to the state, to their detriment, a part of the water necessary to the proper irrigation of their lands.

It is suggested by counsel for the state that the state board of land commissioners did not contract to dispose of all of the available water supply tributary to said school land. We concede that, since said board did not have the disposal of any of the public waters of the state, nor the right to reserve any of the public waters of the state as against prior appropriators. Under the provisions of sec. 3, art. 15, of the state constitution, priority of appropriation gives priority of right, and it is there declared that the right to divert and appropriate the unappropriated waters of any natural stream in this state to a beneficial use shall never be denied. And since all of the water within said project had been appropriated long prior to the time Rayl made his purchases, the state has no right or authority to take such water from a prior appropriator and give it to a subsequent purchaser of school land.

The state had full knowledge that there was not sufficient water for the proper irrigation of the lands it had sold prior to the time it sold said land to Rayl. And under the facts, had the state the right to represent to Rayl, or to lead him to believe, that there was sufficient water within said project for the irrigation of the lands sold to him? Should the state be permitted to say, when conducting a business in its proprietary capacity, that there was a sufficient supply of water for all lands within said project, when it knew that such was not the case, and that there was not a sufficient supply for more land than had already been sold prior to the sale to Rayl?

The state is here seeking to take water from settlers who made their purchases long prior to the purchase made by Rayl, and give a portion thereof to Rayl. The settlers were led to believe, and justly so, that the state had examined the water supply and determined that it was amply sufficient for said entire project, and it was upon such representations that the lands were sold to the settlers by the state. From the

position of the state in this matter, it should act with fidelity and integrity toward the settlers.

In this case, the state, the Construction Company and the operating company all admitted the insufficiency of the water supply to properly irrigate and reclaim more land than was sold prior to the sale to Rayl. The state knew, and admits that it knew, that the water supply was insufficient, but contends that state school lands have a priority over other lands, even though the other lands had been reclaimed years before the sale of the school land.

There is clearly an equitable estoppel against the state which arises out of its conduct in this matter.

And Rayl is in no better position than the state. He had full knowledge that the water supply was not sufficient to properly irrigate the land that had already been sold. Under the facts of this case, the principles of estoppel clearly apply, and the state is not entitled to a priority of right to any of said water for its state lands, unless it should be determined that the water rights already sold are not necessary to the proper reclamation of the lands sold prior to June 11, 1915, the date when the state sold to Rayl the land here involved.

The alternative writ heretofore issued must be quashed and the peremptory writ denied. Costs awarded to defendants.

BUDGE, J.—I concur in the conclusions reached in the opinion of Chief Justice Sullivan under the facts of this particular case.

MORGAN, J., Concurring.—As I view this case, the real question presented is, have school lands a superior claim to water rights over other lands embraced within the project? If such a preference exists it must be found in the contract, a copy of which is attached to the complaint as exhibit "C," and which is referred to in the foregoing opinion as having been entered into between the state and the Construction Company.

A very careful examination of that document fails to disclose any expression from which it may be inferred that it

was the intention of the contracting parties to reserve from
Carey Act and other lands, in the event there was not enough
for all, sufficient water to irrigate school lands or that they
should be preferred over others in the distribution.   Upon
the other hand, the language employed indicates that water
rights should be sold to qualified entrymen or purchasers with-
out preference or partiality.   At the time the contract was
entered into all parties to it believed there was a water supply
ample to reclaim and properly irrigate the 150,000 acres of
land embraced within the original project; no preference was
believed to be necessary and none was provided for, but it was
expressly agreed: "The sale of water rights to the purchasers
shall be a dedication of the water to the lands to which the
same is applied."

The contention that the water supply shall be divided up
and distributed over all the land now within the project, re-
gardless of how small an amount would thereby be available
for any portion of it, cannot be supported.

The purpose of the Carey Act of Congress and of our legis-
lative enactments accepting for Idaho its benefits is the rec-
lamation and irrigation of desert lands in a manner and to
an extent that will make them productive and valuable for
agricultural purposes.

In conformity to these laws and pursuant to its agreement
with the state, contracts were entered into between the Con-
struction Company and settlers, the form of which was ap-
proved by the state, wherein it was agreed that certificates
of shares of the capital stock of the canal company, there-
after to be formed, should be issued to purchasers of land and
water rights, in each of which was to be recited: "This cer-
tificate entitles the owner thereof to receive one-hundredth
of a cubic-foot of water per acre per second of time for the
following described land: [here occurs a blank for the de-
scription] in accordance with the terms of the contract be-
tween the State of Idaho and the Twin Falls-Salmon River
Land & Water Company. . . . . "

It appears from the record in this case that prior to the ap-
plication for a water right by plaintiff, Rayl, more than

enough of these settlers' contracts had been sold and were outstanding to consume the entire water supply available. It follows that to require the defendant, Construction Company, to issue to him the shares of stock which he demands would be a vain and useless proceeding, for it would amount to an order that it issue to him a contract obligating itself and its successor to do the impossible, viz.: Supply him with water which has heretofore been dedicated and become appurtenant to the lands of others.

For the foregoing reasons I concur in the conclusion that the relief prayed for should be denied.

I am not in accord with that portion of the opinion which is to the effect that the state, in dealing with a Carey Act project, does so in its capacity as a private owner. As I understand the Carey Act, its purpose is to procure the reclamation, settlement and cultivation of desert lands, and, with that end in view, provides that such lands may be patented to the state wherein they are located with the ultimate object that they find their way into the hands of settlers. If this is a correct interpretation of the law, the state takes title by virtue of its sovereignty, not as an owner, but in trust for the use and benefit of the settler.

Entertaining these views, I cannot agree that the doctrine of estoppel has any application here.

I am unable to concur in the portion of the opinion which is to the effect that the approval by the Secretary of the Interior of the plan for reclamation of the land embraced within this project, and his finding that the water supply was adequate before the contract for construction was entered into, is conclusive upon the United States. This is a question which must address itself to the officials of the Department of the Interior and, possibly, to the federal courts, but is one not within our jurisdiction to decide.

(July 3, 1917.)

### ON REHEARING.

MANDATE—MUTUAL MISTAKE OF FACT—CAREY ACT PROJECT.

1. A writ of mandate will not issue from this court to compel a Carey Act construction company to issue shares of stock to a purchaser of state school land where the shares of stock already sold are far in excess of the available water supply and the contract entered into between the construction company and the state of Idaho was entered into under a mutual mistake of a material fact.

2. Where a purchaser of school lands under a Carey Act project could not possibly obtain the amount of water his contract would entitle him to receive, and the issuance of shares of stock to the said purchaser would in effect defeat the rights of prior settlers to the water to which they are entitled under their contracts, a writ of mandate will not issue to compel the construction and canal company to sell shares of stock to said purchaser of school land.

3. The state of Idaho in dealing with a Carey Act project acts by virtue of its sovereignty and not in the capacity of a private owner.

4. The doctrine of estoppel cannot be invoked against a sovereign state.

RICE, J.—A rehearing was granted in this case, and the matters involved therein have been re-examined. This is an original application in this court for a writ of mandate to compel the Twin Falls Salmon River Land & Water Company and the Salmon River Canal Company to issue shares of water stock to plaintiff Robert Rayl for water to be used in the irrigation of state school lands purchased by said Rayl in accordance with the terms of a certain contract entered into between the defendants and the state of Idaho.

Upon the argument on rehearing of the case it was admitted by counsel for the state that the state by its contracts had not reserved any preference rights for its lands, and that purchasers of state land occupied no better position by reason of having purchased such land than any other person making application to purchase water rights from the defendants, except

that the state's contract with the Construction Company was prior in time to any contract between the Construction Company and a settler. It was also admitted that the available water supply is not sufficient to properly irrigate the lands for which contracts are already outstanding. The plaintiffs contend, however, that according to the terms of the contract the water supply becomes immaterial; that the plaintiff Robert Rayl, as a purchaser of state lands under said contract, is entitled to a "proportionate interest in said canal and irrigation works, together with all rights and franchises therein, based on the number of shares finally sold in said canal."

The provisions of the various contracts involved in the consideration of this application are very fully set out in the opinion of Chief Justice Sullivan, and it will be unnecessary to repeat them here. It would probably be sufficient to state that the contract between the state of Idaho and the defendant Construction Company was entered into under a mutual mistake of existing conditions, and upon the assumption that certain facts with reference to the water supply existed, which as a matter of fact do not exist. Under such conditions the court will not by its writ in effect decree specific performance of a contract which neither party thereto contemplated when the agreement was executed.

However, the settlers who had purchased water rights from the Construction Company are entitled to consideration in this matter upon their petition in intervention. The contract between the state of Idaho and the Construction Company not only provided that the settlers should be entitled to receive their proportionate interest in the canal and irrigation works, together with all rights and franchises therein based on the number of shares finally sold in said canal, but also that each share should represent a carrying capacity in said canal sufficient to deliver one-hundredth of a cubic-foot of water per acre per second of time. Said contract also provided, in the tenth paragraph thereof, that the certificate of shares of stock in the Salmon River Canal Company, Ltd., should be made to indicate and define the interests thereby represented in the said system, to wit: A water right of one-hundredth of a

cubic-foot per second for each acre of land irrigated as provided in paragraphs IV and VIII of the contract and a proportionate interest in the said canal and irrigation works based upon the number of shares ultimately sold therein.

The contract between the Construction Company and the settlers on the project in effect provided that the owner of a certificate of stock should be entitled to receive one-hundredth of a cubic-foot of water per acre per second of time upon the land described in the certificate, in accordance with the terms of the contract between the state of Idaho and the defendant Construction Company, and that the certificate should also entitle the owner to his proportionate interest in the dam, canal, water rights and other rights and franchises of the Twin Falls Salmon River Land & Water Company, based upon the number of shares finally sold in accordance with the said contract between the said company and the state of Idaho.   It would be an unwarranted construction to hold that by reference to the contract between the state and the Construction Company all that was intended was to state that the owner of the certificate of stock in the Salmon River Canal Company, Ltd., should be entitled only to his proportionate interest in the canals, water rights, etc., of the company based upon the number of shares finally sold to settlers.   If carried to its ultimate conclusion, by such construction the settler might be deprived of any water right whatever.

It should be noted that the provisions of the statutes of the state are expressly referred to and made a part of the contract between the Construction Company and the settler.   By sec. 3293, Rev. Codes, it is provided that no person entitled to the use of water from any ditch or canal must, under any circumstances, use more water than good husbandry requires for the crop or crops that he cultivates.   By reading this law into the contracts, it would follow that the settler is entitled to receive the amount of water specified in his contract to the extent necessary to irrigate the crop or crops which he cultivates in accordance with the usages of good husbandry. He would not be entitled to receive a greater amount than is

necessary to irrigate his crops, nor in any event a greater amount than that specified in the contract.

It being conceded that the actual water supply is wholly insufficient to furnish the settlers with the amount of water to which they are entitled under their contracts, it necessarily follows that the plaintiff Robert Rayl could not possibly obtain what his contract would entitle him to receive. Moreover, if a writ should issue, its effect would be to defeat the intervenors to a still further extent in obtaining the rights to which they are entitled under their contracts. It cannot be held that the defendants owe a duty to the state of Idaho to make the contract prayed for in the petition.

Upon consideration of the case on rehearing this court is of the opinion that the state in dealing with a Carey Act project acts by virtue of its sovereignty and not in the capacity of a private owner, and that the doctrine of estoppel cannot be invoked against a sovereign state.

With reference to the question of the finality of the action of the state and the Department of the Interior in determining that sufficient water supply existed and its bearing upon the right of the state to receive patents for the public land segregated from the public domain upon the application of the state, it should be noted that since the argument upon rehearing was had, the circuit court of appeals for the ninth circuit has rendered its opinion in the case of *Twin Falls Salmon River Land & Water Co. v. Caldwell* (C. C. A.), 242 Fed. 177, upon appeal from the United States district court for Idaho, in which it held that the action of the Secretary of the Interior in approving the proposed plan for the irrigation of public lands applied for by the state, and in making an order segregating those lands from the public domain, was not a conclusive determination against the United States that the state of Idaho was entitled to a patent therefor for the benefit of the settlers. Although this question was presented upon the argument, it is not involved in the matter before the court.

The alternative writ will be quashed and the peremptory writ denied. Costs awarded to defendants.

Budge, C. J., and Morgan, J., concur.